485 S.E.2d 176

**In re JOSEPH A. and JUSTIN A.**

**No. 23780.**

Supreme Court of Appeals of
West Virginia.

Submitted Jan. 15, 1997.

Decided March 26, 1997.

Ira Haught, Harrisville, Guardian Ad Litem.

Ernest M. Douglass, Douglass and Douglass, Parkersburg, for Appellant.

Joanna Bowles, Assistant Attorney General, Charleston, for Appellee.

MAYNARD, Justice:

This is an appeal by Glen A., Jr. from an order of the Circuit Court of Wood County, West Virginia, entered on May 21, 1996, denying the father an improvement period and continuing legal custody of Justin A. and Joseph (Joey) A.[1] in the Department of Health and Human Resources (DHHR) for placement in long-term foster care. Glen A. contends the trial court erred in: (1) finding abuse by clear and convincing evidence; (2) denying an improvement period; and (3) excluding Glen A. during the testimony of Justin A. at the adjudicatory hearing. We find no reversible error; therefore, the order of the Circuit Court of Wood County is affirmed.

Appellant, Glen A., a widower, is the father of Justin A. and Joey A. At the time the juvenile neglect petition was filed in January 1996, Justin was fourteen years old and Joey was eight years old. The appellant is also the father of two older children, Stacy and Scott, who have reached the age of majority and are emancipated.

According to the juvenile neglect petition, the appellant threw a glass ashtray at Joey on January 17, 1996, resulting in a one to one-and-one half inch laceration on the back

---

1. We follow our traditional practice in cases involving sensitive facts and use initials to identify the parties rather than their full names. *See In re Jeffrey R. L.,* 190 W.Va. 24, 435 S.E.2d 162 (1993).

of Joey's head. At school, two days later, Joey was sent to the school nurse, Diane Fuchs, who testified at the adjudicatory hearing and described a gaping and deep laceration with dried blood that needed sutures. Since the family had no telephone, Ms. Fuchs took Joey home. She explained Joey's medical needs to the appellant, including the possibility of needing sutures. The appellant answered that his car had a flat tire, so Ms. Fuchs offered to take the appellant and Joey to the emergency room. The appellant declined the offer. It was obvious to Ms. Fuchs that the appellant was not going to take Joey to the emergency room, so she offered advice on how to care for the laceration in lieu of medical treatment. She told him to keep the area clean, shave around the cut, and pull it together with steri-strips to promote faster healing.

Ms. Fuchs testified the appellant explained Joey's injury by stating the child fell against a box in the bedroom. Without any accusation from Ms. Fuchs, the appellant defensively and emphatically denied playing any role in Joey's injury.

The appellant recalled the visit somewhat differently. He testified at the dispositional hearing that the nurse gave him the option of taking Joey to the hospital or treating the wound himself with steri-strips. He informed Ms. Fuchs he had some steri-strips.[2]

The weekend passed, and on Monday, January 22, 1996, Joey had not yet received medical attention for the deep cut on his head. A family member took Joey to the DHHR and showed the laceration to Ms. Spiker, a Child Protective Service Worker with whom the family was already involved. Ms. Spiker later testified the laceration was matted with dried crusted blood and contained yellow areas suggesting that infection was present. She also testified Joey's hair did not appear to have been washed since the nurse's visit, three days earlier.[3]

Ms. Spiker testified that she asked the family member to take Joey to the hospital while she and another social worker went to the appellant's home. When asked if he knew what had happened to Joey's head, the appellant told Ms. Spiker the child fell on a wooden box while playing in his bedroom. When asked why he had not followed Ms. Fuch's recommendations regarding treatment, the appellant answered "he didn't do anything to the laceration because he didn't want his neighbors to call the welfare on him." When Ms. Spiker informed the appellant that lack of medical attention could have caused medical problems for Joey, he again responded "he didn't want the welfare to be called on him." According to defense counsel, the appellant believed the referral in this case came about as a result of his having had an affair with his neighbor and his neighbor's husband had reported the abuse "to get back at him."

The referral regarding Joey and Justin also alleged the appellant owned a number of pornographic movies, which were easily accessible to his sons. When the appellant was questioned about having pornographic movies, he answered there were none in the home. Ms. Spiker opened the television stand, and the first three movies she removed were pornographic in nature. She recognized the movies as pornographic by the titles and by the accompanying filing cards which described the contents of the films. The movies were titled *The First Nudie Musical, Hollywood Uncensored,* and *Slammer Girls.* The appellant informed the social workers that *Slammer Girls* was an R rated prison movie, so Ms. Spiker insisted that they view a few moments of the movie. The social workers witnessed four to five women having sex with one another. Ms. Spiker found at least one tape which contained both children's cartoons and adult movies. When confronted with the fact that he had not been truthful about owning these movies, the appellant responded that his sons

**2.** The appellant finally found the steri-strips, to use in treating Joey's wound, on Monday, January 22, 1996, after he found out "the kids were not coming home from school."

**3.** During a prior abuse and neglect proceeding, the appellant had been granted a post-adjudica-tory improvement period. At that time, Christine Spiker, a Child Protective Service worker, became involved with the family. She worked with the appellant for approximately one-and-one half to two years as overseer of the improvement period.

had been told they were not allowed to watch those movies.[4]

The petition filed by Ms. Spiker additionally alleged that the appellant stored gunpowder in a can in the kitchen. The social worker noted during her testimony that the appellant had shown her the can with gunpowder in it, while Justin testified the gunpowder was kept in a cardboard peanuts can and stored in a cabinet by the refrigerator. He testified he and Joey had played with the gunpowder by taking it outside and lighting it.

The petition also stated the appellant kept a loaded pistol in a location which was accessible and known to the children. During Ms. Spiker's visit to the home, the appellant led her to his padlocked bedroom and showed her the gun. When asked if the gun was loaded, the appellant took the bullets from the gun and tossed both the gun and the bullets on the bed. Justin testified his dad told him he kept some guns in his bedroom, but Justin had never seen them. The appellant told Ms. Spiker the room was padlocked when the children were home alone, and they were not allowed in the room.

During Justin's testimony, he further testified that his father had mood swings and had threatened to kick him out of the house if he kept missing the bus after school and walking home. The petition alleged the appellant had threatened on numerous occasions to give Joey to the Department.

Justin was cross-examined regarding the events that happened the evening Joey was injured. Justin stated their father wanted to see what Joey had in his hands. Joey showed him the hand in which he was holding a piece of metal, but not the hand in which he was holding a screwdriver. Justin then heard the ashtray hit Joey, who started crying. Justin was asked by the appellant's counsel if the ashtray was thrown "overhand, underhand, side-armed." He answered he

was not watching when his father threw the ashtray because he was watching television. He did not see it strike his brother except out of the corner of his eye. He testified this was not the first time the appellant had thrown the ashtray at Joey.

The DHHR traced the history this family has had with the Department, beginning in May 1989, shortly after the death of the children's mother in November 1988. The report prepared by Child Protective Service Worker, Joan George, states that initially Justin exhibited behavioral and hygiene problems, and concerns were raised regarding fifteen-month old Joey because there was no running water in the home. The appellant was provided services regarding budgeting and was taught to utilize community resources. Justin was provided with counseling regarding his mother's death. In October 1989, social services were discontinued.

In March 1991 the DHHR substantiated allegations of neglect and emotional abuse. Stacy, only sixteen years old at the time, was caring for both her siblings and was maintaining the house. Stacy was having suicidal thoughts and was afraid her father would kill her. Counseling was initiated. A social worker assisted the appellant by offering parenting skills education along with problem solving and discipline techniques. These services were being provided when Stacy disclosed in April 1992 that the appellant had sexually abused her.

Pursuant to the filing of a petition, the three children were adjudicated to be abused and neglected, and the appellant was charged with criminal sexual abuse. The appellant was acquitted of the criminal charges in March 1993. The court granted a post-adjudicatory improvement period beginning April 15, 1993. In August 1994, Stacy was eighteen years old and emancipated. At that time, the boys were returned to the appellant's home. Action Youth Care provided reunification services, which were closed in

---

4.  Justin testified during the adjudicatory hearing that his father kept adult movies in their home:
    Q  Does your dad keep dirty movies in the house?
    A Yeah, he has a couple.
    Q   Have you seen some of those movies yourself?

A A couple of them.
    Q   Does he keep them in a place that you have access to; I mean, can you get them pretty easy if you want to see them.
    A Yeah, most of them.

June 1995, when it was believed that all possible progress with the appellant had been made.

The DHHR next received a referral regarding the physical abuse of Joey in December 1995. Joey denied the abuse and there was no apparent physical evidence of abuse. Then, in January 1996, the incident involving the cut on the back of Joey's head precipitated the filing of the instant petition.

The trial court held an adjudicatory hearing on March 29, 1996. The court adjudicated the children to have been abused. A dispositional hearing was held on May 16, 1996. In its final order, the court denied the appellant's motion for an improvement period and placed the children in long-term foster care. It is from this order that the appellant appeals.

■ On appeal, the appellant contends the evidence in this case is legally insufficient to find abuse by clear and convincing evidence. He argues the evidence is insufficient because Justin did not actually see him throw the ashtray, and no medical testimony was presented to invalidate the appellant's explanation that Joey fell against a box. He also argues no evidence was presented to verify that the school nurse's suggested treatment was necessary or that Joey's well-being was harmed by the lack of medical care. The appellant further contends that no expert testimony was presented which showed that the children's exposure to pornography harmed their safety and well being. The DHHR argues the court properly found a long and substantial history of abuse and neglect by the appellant.

■ In Syllabus Point 1 of *West Virginia Department of Health and Human Resources ex rel. Wright v. Brenda C.*, 197 W.Va. 468, 475 S.E.2d 560 (1996), we said:

" ' "W.Va.Code, 49–6–2(c) [1980], requires the State Department of Welfare [now the Department of Human Services], in a child abuse or neglect case, to prove 'conditions existing at the time of the filing of the petition ... by clear and convincing proof.' The statute, however, does not specify any particular manner or mode of testimony or evidence by which the State Department of Welfare is obligated to meet this burden." Syllabus Point 1, *In Interest of S.C.*, 168 W.Va. 366, 284 S.E.2d 867 (1981).' Syllabus Point 1, *West Virginia Department of Human Services v. Peggy F.*, 184 W.Va. 60, 399 S.E.2d 460 (1990)." Syllabus Point 1, *In re Beth*, 192 W.Va. 656, 453 S.E.2d 639 (1994). Syl. Pt. 3, *In re Christina L.*, 194 W.Va. 446, 460 S.E.2d 692 (1995).

Although W.Va.Code § 49–6–2(c) was amended by the West Virginia Legislature in 1996 and the Department of Human Services is now known as the Department of Health and Human Resources, these changes do not alter the fundamental holding that proof of abuse and neglect must be by clear and convincing evidence. Here, not only was evidence presented that the appellant seriously injured his son, Joey, but he then forced Joey to wipe up his own blood. He clearly refused to give or to allow Joey to receive any medical attention with the excuse that he did not want the welfare department to be called.

Appellant criticizes the DHHR for not presenting testimony by a psychologist that the children were harmed by viewing pornographic movies. He claims he did not encourage the children to watch the videos and they did not watch the movies with him or with his knowledge. We do not believe it is necessary for the trial court to require the DHHR to present the testimony of an expert in order to conclude that watching pornography has harmful effects upon minor children.[5] Given the long history of this family

---

5. In her report to the court, Joan George, a Child Protective Service Worker, wrote to the trial judge:

> In the Department's five years of service to this family Mr. A. has consistently maintained a very closed family system. Mr. A. expected all the needs of the individuals to be met by the family. Influence from outside the family was not desirable. The children were restricted from developing peer relationships, confined to

the home and socially isolated in part to protect family secrets of abuse. This manner of relating remains unchanged.

It is difficult to know to what degree the children are abused and neglected in this system of rigid control where secrecy is valued above all else. We have known, however, since 1992, with Stacey's disclosure, that she was being sexually abused from at least as far back as 1989. We also know, that there have been

and the more recent events involving Joey's serious head injury, the lack of needed medical care, the presence of gun powder in the home, and keeping and allowing the children to have access to pornographic videos in the home, we believe the trial court properly found that this appalling misconduct constituted clear and convincing proof of abuse and neglect.

■ The appellant next contends the trial court erred in denying his motion for an improvement period. Even though the appellant acknowledges the court may deny parents an improvement period if compelling circumstances justify denial, he argues that since he achieved reunification once before, there is no reason to believe he could not do so again. The appellant admits his temper is not under control, but seems to argue the DHHR should offer him counseling. The guardian ad litem stated the appellant was given in excess of three years to improve the situation in which he was raising these two boys, but failed to make substantial improvements.

The DHHR asserts the lower court properly denied an improvement period because of the appellant's history during the previous abuse and neglect proceeding. The Department also maintains that the appellant continues to exhibit behavior that is in sharp contrast to the internalization of proper parenting skills and argues the lower court did not err in failing to grant a post-adjudicatory improvement period on the basis that reunification was previously achieved.

After Justin and Joey were adjudicated to be abused and neglected, the court held a dispositional hearing where counsel for the children offered his opinion, by stating,

Your Honor, I've discussed these matters with Justin, who's the oldest (sic) of the two boys, and it's my opinion that Mr. A. does, in fact, throw things at the boys and he did inflict this injury upon Joseph, as Justin testified to at the adjudicatory hearing, and I do not believe that there's any reason to grant him an additional improvement period, don't believe it would be beneficial. The boys don't have any interest in visiting their father, let alone living with him.

In his argument to the court at the dispositional hearing, appellant's counsel stated, "I don't believe that this incident was so serious that it would constitute a compelling reason to deny the improvement period." The court pointed to behavior of the appellant which transcended the thrown ashtray, the child's injury, and the failure to seek or provide medical treatment. The court described as "pretty significant" the content of some letters the appellant wrote to his older son, Scott. The court stated:

What nobody's mentioned, of course, is one thing I think is pretty significant, is these letters which he wrote to his children. Even though Mr. A. says he didn't mean what they clearly say, I don't see how you can read them any other way than being some kind of a veiled threat. And they clearly state that the reason he wants them back is because he needs the money that the State would pay him for having his children to be able to pay his own rent. . . .

These letters are a clear threat to do something, something pretty bad obviously. He said, "I will have to turn from Doctor Jekyll to Mr. Hyde. All I want is for you to come home and sit down like a man and talk to me face to face. That's all I'm asking. What I am thinkin I will

numerous incidents of unreported physical abuse to Justin and Joey. Sexually explicit videos remain in the home, easily accessible to these children. Exposure to adult sexual activities can have far reaching effects on the personality and behavior of child victims. To assume that Justin and Joey because of their gender, are not at risk of sexual abuse may be at their peril. It is obvious from their history that neither would be readily able to protect themselves by requesting help with a secret of such magnitude.

Mr. A. has continued to deny any abusive behavior towards his children, while presenting a very descriptive scenario of events in stark contrast to reality. Additionally, Mr. A. has written several letters to his son, Scott A., attempting to bribe, intimidate, and threaten him into lying about the abuse so he, Mr. A., could have his children returned and be eligible for AFDC.

do—" underscored "—as long as I have the kids back before the 29th of this month I will not do—" I will not do, and it's underscored "—what I already will do or thinking about. It's all up to you, Scott." He even gave a deadline. "You only have until this weekend—" and he underscores that "—for me not to do it."

And he says, "If you don't come this weekend, expect me to do something. I will have to turn from Doctor Jekyll to Mr. Hyde." There's no other way to read that than a threat to do something outrageous, because Mr. Hyde was certainly an outrageous person, he did outrageous things, and this is what he's threatening to do. Nothing specific, but something outrageous.

And he says, "This is your last warning." A warning. "I hope you don't upset me by not showing up or not calling. This will be my last letter to you until I see you or see or hear from you, and if you don't think I have something to work by that, you'd better be prepared for the worst."

I don't see any reason to grant this man another improvement period. He's had one before. He went through the motions and apparently pulled the wool over the eyes of the department and they put the children back in his care, which was probably a mistake, but, you know, everybody's human and makes mistakes. The fact the department put them back with him and thought he had completed the improvement period satisfactorily doesn't mean that he did. And then this other abuse took place. It clearly was abuse. And these letters are very revealing of the character of Mr. A.

I'm not going to grant him an improvement period. I'm going to follow the recommendation of the department and the recommendation of Counsel for the children and put these children in long-term foster care under the jurisdiction of the department. That's all.

During the pendency of this action, W.Va. Code § 49–6–2(b) (1992), stated in pertinent part:

In any proceeding under this article, any parent or custodian may, prior to final hearing, move to be allowed an improvement period of three to twelve months in order to remedy the circumstances or alleged circumstances upon which the proceeding is based. The court shall allow one such improvement period unless it finds compelling circumstances to justify a denial thereof[.] [6]

■ This statute does not automatically require that a parent be granted an improvement period. In Syllabus Point 2 of the *Matter of Jonathan P.*, 182 W.Va. 302, 387 S.E.2d 537 (1989), this Court said, " 'W.Va.Code, 49–6–2(b) (1984), permits a parent to move the court for an improvement period which shall be allowed unless the court finds compelling circumstances to justify a denial.' Syllabus Point 2, *State ex rel. W.Va. Dep't of Human Services v. Cheryl M.*, [177] W.Va. [688], 356 S.E.2d 181 (1987)." We reiterated in *In re Lacey P.*, 189 W.Va. 580, 433 S.E.2d 518 (1993), that there is no absolute right to an improvement period in this State.

In *State ex rel. West Virginia Department of Human Services v. Cheryl M.*, 177 W.Va. 688, 356 S.E.2d 181 (1987), the trial court did not grant an improvement period to Cheryl M. As a result, the Department of Human Services (DHS) did not present a family case plan to the court. The DHS took the position from the beginning of their involvement with Cheryl M., prior to any parenting assistance being offered, that her parental rights should be terminated. This Court found the DHS had provided little relevant assistance and had made no good faith effort toward developing a rehabilitative plan. A counselor with the local mental health agency testified that Cheryl M. cooperated during counseling sessions on parenting skills and progressed in her skill level. The counselor testified that it was her opinion that there was no imminent danger in reunifying Cheryl M. with her child. This Court concluded that under these circumstances the mother was entitled to a meaningful improvement period

**6.** This Code section was amended by the West Virginia Legislature in 1996.

to demonstrate her ability to care for her child.

Obviously, the facts in the case at bar are very different. Apart from the abuse and neglect discussed above, the appellant did not successfully complete the tasks enumerated in the family case plan that was submitted when he was granted a prior improvement period. There is no evidence in the record nor was any testimony presented to establish the appellant's attendance at weekly therapy sessions or participation in a substance abuse assessment. The appellant was provided with reunification and family preservation services as well as individual social worker counseling and education, group education and support, in-home modeling of appropriate parenting behavior, individual therapy and psychological services, and intensive family education. Yet, all of these services failed to prevent the incidents which gave rise to these proceedings. There is also evidence Justin and Joey were deliberately socially isolated from outside influences and peer relationships, possibly to protect family secrets of abuse. Therefore, we cannot say the trial court in this case improperly found compelling circumstances existed that justified denying an improvement period.

After being removed from the home, the children had three supervised visits with their father. Ms. George concluded after the third visit:

> Each of these visits with Mr. A. was emotionally stressful and of no benefit to the children. Justin has stated that he has no particular interest in visiting his father. Joey has been disappointed and hurt with each contact. In consideration of the affect (sic) visits with Mr. A. have had on these children, visits are arranged only upon request from the children.

Evidence was also presented that there was no indication the children lived in their father's trailer; the toys and the children's clothes had been locked away in an "irrational attempt to disguise a rather sadistic ploy to control[.]" Apparently, no further visits

were requested, because the appellant testified that he had visited with his sons on three occasions since their removal. In view of the circumstances listed above, we find the trial court did not err in refusing to grant to this appellant a second improvement period.

■ On appeal, the appellant also alleges the trial court erred in excluding him from the *in camera* adjudicatory hearing when his son, Justin, testified. The DHHR requested that Justin be permitted to testify out of the presence of his father. The court granted the motion, and the appellant appeared to acquiescence and only asked if he could use the restroom. However, appellant's counsel "object[ed] to the procedure, just for the record." There was no request for appellant's counsel to leave the room. Appellant's counsel was present during all of Justin's testimony and was afforded the opportunity to fully cross-examine Justin. In fact, the attorney exercised this opportunity and did indeed fully and completely cross-examine Justin.

■ W.Va.Code § 49–6–2(c) (1996), is controlling on this issue and states in pertinent part:

> In any proceeding pursuant to the provisions of this article, the party or parties having custodial or other parental rights or responsibilities to the child shall be afforded a meaningful opportunity to be heard, including the opportunity to testify and to present and cross-examine witnesses.

The requirement of cross-examination was satisfied by the presence of the appellant's counsel and the meaningful cross-examination which ensued after Justin was questioned by the DHHR. The approach used here is permissible under the new Rules of Procedure for Child Abuse and Neglect Proceedings, which were not yet in effect when this case was tried, but which this Court approved on December 5, 1996. Rule 8(b) [7]

---

7. Rule 8(b) of the Rules of Procedure for Child Abuse and Neglect Proceedings states:

(b) *Procedure for taking testimony from children.* The presiding judicial officer may conduct *in camera* interviews of a minor child, outside the presence of the parent(s). The parties' attorneys shall be allowed to attend such interviews,

except when the presiding judicial officer determines that the presence of attorneys will be especially intimidating to the child witness. When attorneys are not allowed to be present for *in camera* interviews of a child, the presiding judicial officer shall, unless otherwise agreed by the parties, have the interview electronically or

controls the procedure for taking testimony from children in abuse and neglect proceedings in future cases. The result we reach today would be reached under the new rules; thus, we find no reversible error.

■ Lastly, the appellant argues the permanency plan, also called the child's case plan or the family case plan, is inadequate because the plan fails to state how or when a permanent home will be achieved for these children. The DHHR states the case plan is adequate in that permanency has not yet been determined and the plan specifically addresses the long-term foster care in which the children currently are placed.

W.Va.Code § 49–6–5(a) (1996), states in pertinent part,

The term permanency plan refers to that part of the case plan which is designed to achieve a permanent home for the child in the lease restrictive setting available.... If reunification is not the permanency plan for the child, the plan must state why reunification is not appropriate and detail the alternative placement for the child to include approximate time lines for when such placement is expected to become a permanent placement.

At the time of the writing of the children's case plan on May 13, 1996, Justin and Joey were living with their sister, Stacy, and her family. The plan recites the inadequacy of the placement as a long-term arrangement. However, the plan also addresses the alternative placement of the children by noting that "long term foster care with optimal contact between these siblings will be in the best interest of all family members." The plan goes on to state "[l]ong term foster care with a permanent placement commitment from a foster family is the permanency plan ... in the event custody remains with the Department." The Department reports the children are no longer living with their sister, who is now married with two children of her own, but have been placed together in a foster home with the anticipation that the foster parents will welcome Justin and Joey as permanent placements.

The plan specifically states in detail why reunification with the appellant is not appropriate, most notably the appellant's failure to maintain any gains in coping skills or in his beliefs and attitudes about parenting during the three years he was given to improve. When we look at the facts of this case and the procedural status of this action at the time the permanency plan was written, we believe placement with a family member and later in a foster home by long-term foster care is the least restrictive alternative available. Given that custody and permanency still remain unresolved at this time, we cannot say the plan is inadequate.

For the above stated reasons, the judgment of the Circuit Court of Wood County is affirmed.

Affirmed.

stenographically recorded and make the recording available to the attorneys before the evidentiary hearing resumes. Under exceptional circumstances, the presiding judicial officer may elect not to make the recording available to the attorneys but must place the basis for a finding of exceptional circumstances on the record. Under these exceptional circumstances, the recording only will be available for review by the Supreme Court of Appeals. When attorneys are present for an *in camera* interview of a child, the presiding judicial officer may, before the interview, require the attorneys to submit questions for the presiding judicial officer to ask the child witness rather than allow the attorneys to question the child directly, and the presiding judicial officer may require the attorney to sit in an unobtrusive manner during the *in camera* interview.