514 S.E.2d 631

**STATE of West Virginia, Petitioner Below, Appellee,**

v.

**TAMMY R., Mother; Mark J., Father; and Kia Shante Marie H., Infant, Respondents,**

**Tammy R., Respondent Below, Appellant.**

**No. 25348.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 26, 1999.

Decided March 12, 1999.

Nancy A. Dalby, Hamstead & Associates, Charles Town, West Virginia, Attorney for Appellant.

Darrell V. McGraw, Jr., Attorney General, Barbara L. Baxter, Assistant Attorney General, Charleston, West Virginia, Attorneys for the State.

John W. Askintowicz, Charles Town, West Virginia, Attorney for Kia H.

David A. Camilletti, Shepherdstown, West Virginia, Attorney for Mark and Helen J.

PER CURIAM:

This appeal was filed by Tammy R.[1], appellant/respondent below, (hereinafter referred to as Tammy), from a ruling by the Circuit Court of Jefferson County. The circuit court placed Kia H. (hereinafter referred to as Kia), the daughter of Tammy, in permanent foster care with her paternal grandmother, Helen J., appellee/intervenor below[2] (hereinafter referred to as Helen), after Tammy's parental rights to Kia were terminated by an order of the circuit court. This Court limited the appeal of this matter to the issue of the appropriateness of the final dispositional placement of Kia. After a review of the parties' arguments, the record submitted on appeal and the relevant authorities, we conclude that the circuit court's ruling regarding the placement of Kia was not clearly erroneous. Consequently, we affirm the Circuit Court of Jefferson County.

## I.

## FACTUAL AND PROCEDURAL HISTORY

A civil abuse and neglect petition was filed on July 1, 1997, against Tammy and Mark J. (hereinafter referred to as Mark), the biological parents of Kia.[3] At the time the petition was filed, criminal charges were pending against both Tammy and Mark.[4] After the petition was filed, Mark was sentenced to prison for life without the possibility of parole for murder in the first degree. Tammy was sentenced to serve eight to ten years in prison in connection with her involvement in the murder.

A hearing concerning the termination of Tammy's and Mark's parental rights was held before the circuit court on March 13, 1998.[5] However, the actual order wherein the circuit court terminated the parental rights of Mark and Tammy to Kia was not entered until July 14, 1998.

A final dispositional hearing regarding the permanent placement of Kia was held on June 22, 1998. The circuit court refused to permit Tammy and Mark to participate in the dispositional hearing because their parental rights had been terminated at the March 13, 1998, hearing. During the final dispositional hearing, the State, through the Department of Health and Human Resources (hereinafter referred to as DHHR), and the

---

1. We follow our traditional practice in cases involving sensitive facts and use initials to identify the parties rather than their full names. *See In re Jeffrey R.L.*, 190 W.Va. 24, 435 S.E.2d 162 (1993).

2. Response briefs in this case have been filed by Helen, by the State, on behalf of the Department of Health and Human Resources, and by the guardian ad litem, on behalf of Kia.

3. Kia was born on December 9, 1996, while her mother was incarcerated.

4. The abuse and neglect petition was filed as a result of the incarceration of Tammy and Mark and their inability to care for Kia. Immediately after Kia was born, Tammy voluntarily gave temporary custody of Kia to the child's paternal grandmother, Helen. Within six months of Helen's custody of Kia, Tammy filed a family violence petition against Helen. Kia was then re-

moved from Helen's home and placed with Tammy's adult brother. However, Tammy's brother relinquished Kia to the sheriff's department alleging that he was unable to care for her. Subsequently, the abuse and neglect petition was filed against Tammy and Mark on the grounds of abandonment.

5. The hearing was actually intended to be an adjudicatory and final dispositional hearing involving the abuse and neglect charges against Tammy and Mark and custody of Kia. During the hearing, the circuit court terminated the parental rights of Tammy and Mark on the grounds of abandonment, which resulted from their long-term imprisonments. The circuit court also was prepared to resolve the issue of Kia's permanent custody. Unfortunately, the Department of Health and Human Resources had not completed its investigation into the permanent placement of Kia. Consequently, the circuit court continued the final dispositional hearing.

guardian ad litem both recommended that Kia be placed in permanent foster care with her paternal grandmother Helen. The circuit court accepted the recommendation and placed Kia in permanent foster care with Helen. Tammy immediately appealed the circuit court's oral ruling [6] on the placement of Kia.[7]

## II.

### STANDARD OF REVIEW

■ We are asked to reverse an order of the circuit court placing Kia in permanent foster care with her paternal grandmother. The standard of review in abuse and neglect proceedings was set forth in Syllabus point 1 of *Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996), in which we said:

Although conclusions of law reached by a circuit court are subject to de novo review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

Bearing in mind this standard of review, we proceed to discuss the sole substantive issue of this appeal.

6. The actual order on this ruling was not entered until December 2, 1998.

7. The petition for appeal filed by Tammy challenged both the termination of her parental

## III.

### DISCUSSION

■ The circuit court adopted the child case plan and permanency plan submitted by DHHR, which recommended that Kia be placed in the permanent guardianship of DHHR with physical placement to be with Helen as the permanent foster parent. In Syllabus point 2 of *State v. Michael M.*, 202 W.Va. 350, 504 S.E.2d 177 (1998), we held that "[w]here parental rights have been terminated pursuant to W. Va.Code § 49–6–5(a)(6) [1996], and it is necessary to remove the abused and/or neglected child from his or her family, an adoptive home is the preferred permanent out-of-home placement of the child." Syllabus point 3 of *Michael M.* further held:

In determining the appropriate permanent out-of-home placement of a child under W. Va.Code § 49–6–5(a)(6) [1996], the circuit court shall give priority to securing a suitable adoptive home for the child and shall consider other placement alternatives, including permanent foster care, only where the court finds that adoption would not provide custody, care, commitment, nurturing and discipline consistent with the child's best interests or where a suitable adoptive home can not be found.

In the underlying proceeding the circuit court indicated that its reasons for adopting DHHR's child case plan and permanency plan were based:

Upon the presentation of all the evidence in this case, including the fact that both parents are incapable of correcting the conditions of neglect or abuse by virtue of their lengthy confinements in prison; upon the completion of the home study of Helen [J.], the paternal grandmother of Kia [H.], indicating that she is a suitable caretaker for Kia and that she is the closest living relative of Kia and that she is the only relative of Kia who was willing to take care of her; [and] upon the receipt of the

rights and the permanent placement of Kia. This Court limited the appeal to the single issue of Kia's placement.

home studies and psychological evaluations[.]

The suitability of Helen as the permanent caretaker of Kia was approved by DHHR and the guardian ad litem as a result of numerous factors. The record indicates that Helen is fifty-seven years old and resides with Rodner P. (hereinafter referred to as Rodner), a man with whom she has lived for thirty-five years.[8] Helen and Rodner have both been employed steadily throughout their adult lives.[9] Kia lived with Helen and Rodner during the first six months of her life.[10] The record indicates that Helen regularly visited with Kia while she was in temporary foster care. Additionally, in a report that resulted from a psychological evaluation of Helen performed by Dr. Brian Wexler, the following was indicated:

> Following a thorough clinical evaluation and testing, it is my impression that [Helen] is fit to assume custody of her granddaughter Kia. She appears to be emotionally and financially stable, and based on a review with her social worker, her living conditions appear more than suitable for Kia's placement.[11]

Based upon the evidence presented to the trial judge, Kia was placed in permanent foster care with her paternal grandmother Helen,[12] as Helen and Rodner were the only natural family members with whom Kia had established any type of meaningful relationship.

Tammy now asks this Court to reverse the circuit court's placement of Kia. Tammy first argues that the trial court committed error by not permitting her to be represented in person or by counsel at the dispositional placement proceeding. The next argument raised by Tammy is that Helen is not a suitable caretaker for Kia. Finally, Tammy urges this Court to disallow biological family members, who are fit and proper in all respects, from taking permanent custody of a child, whose parents' parental rights have been terminated, because "an adoptive home is the preferred permanent out-of-home placement of the child." We now address each of Tammy's objections.

■ A person's legal right to participate during a dispositional placement proceeding is succinctly set forth in W. Va.Code § 49–6–2(c) (1996) (Repl.Vol.1998), which provides in relevant part that "[i]n any proceeding pursuant to the provisions of this article, the party or parties having custodial or other parental rights or responsibilities to the child shall be afforded a meaningful opportunity to be heard, including the opportunity to testify and to present and cross-examine witnesses." This statute affords standing in an abuse and neglect proceeding to a party who has "custodial or other parental rights or responsibilities to [a] child". Regarding this issue, the circuit court's order states "that there was no further necessity of the appearance, in person or by counsel, of either Respondent parents since their parental rights had been previously terminated." As such, the circuit court's ruling, in effect, dismissed Tammy as a party to the litigation.

The hearing regarding the termination of Tammy and Mark's parental rights was held on March 13, 1998, and at that time, the circuit court terminated their parental rights. It should be reiterated, however, that the circuit court did not enter its final order terminating the parental rights of Mark and Tammy to Kia until July 14, 1998, almost one month after their dispositional hearing determining Kia's permanent placement. Tammy had a right to challenge the court's termi-

---

8. The record indicates that four or five children were born from this relationship. It appears that Rodner is approximately twenty-one years older than Helen. They began dating when Helen was twenty-one years old. Rodner was married, but separated from his wife, when they began dating. It appears that Rodner never divorced his wife.

9. Rodner is now seventy-eight years old and has apparently retired from work.

10. Kia was removed from Helen's home after Tammy filed a family violence petition against Helen. Ultimately, the family violence petition was determined to be unfounded and was dismissed.

11. Dr. Wexler also found that Rodner would be a suitable caretaker for Kia, notwithstanding his age and health limitations.

12. The trial court indicated that Helen could seek to adopt Kia, if she so chose.

nation decision by seeking an appeal, but not until the circuit court issued its final order, which was after the dispositional hearing.[13] Tammy's right to participate in the dispositional hearing, in person or by counsel, could not be denied until there had been a final ruling by the circuit court regarding the termination of her parental rights. Thus, the court's refusal to permit Tammy's participation in the dispositional hearing was error.

■ Ultimately, the trial court's error in excluding Tammy from the dispositional placement hearing was harmless. *See In re Joseph A.*, 199 W.Va. 438, 485 S.E.2d 176 (1997) (finding harmless error where trial court excluded a parent from being present during the testimony of a child, because subsequent law permitted such an exclusion). The error was harmless because the record indicates that the trial court was aware of all material evidence Tammy wanted to present at the dispositional placement hearing. That is, Tammy wanted to present evidence to support her desire to have Kia placed with Jeffrey and Patricia Benedict.[14] The trial court was also aware of the Benedicts' desire to adopt Kia. In fact, DHHR had obtained an evaluation of the Benedicts.[15] However, after obtaining the evaluation, the DHHR nevertheless recommended permanent placement with Kia's relatives to be in her best interest.[16]

■ Next, Tammy asserts that Helen is not a suitable caretaker for Kia. Tammy has alleged that drug activity was taking place in Helen's home and that Helen helped Mark elude capture by the police. To support her contentions, Tammy wanted to call as a witness, during a pre-adjudicatory hearing, former state trooper Ginger Burker who would have reportedly testified to drug activity in Helen's home as well as efforts by Helen to assist Mark in hiding from the police. The record is very clear that the purported testimony of former trooper Burker and other evidence of Helen's suitability[17] were well

13. Tammy did not appeal the decision terminating her parental rights until after the circuit court issued its final order and after the dispositional placement hearing. As previously indicated, however, this Court denied Tammy's petition for appeal on the issue of termination of her parental rights.

14. It appears that Mr. Benedict was a chaplain at a regional jail where Tammy was temporarily confined. Tammy met and befriended Mr. Benedict during her stay at the regional jail. The relationship culminated in Mr. Benedict agreeing to seek custody of Kia.

15. Psychological testing was done on the Benedicts. The testing revealed prior marital problems in the home but, overall, present stability.

16. Tammy also contends that it was error for the trial court to deny the Benedicts' motion to intervene. Tammy does not have standing to make this argument.

17. It was indicated during oral argument that the trial judge presided over the criminal prosecutions of Tammy and Mark and heard testimony regarding the allegations against Helen. Additionally, the trial judge was aware of the allegations based upon the family violence petition that was filed against Helen by Tammy. During a pre-adjudicatory hearing held on February 9, 1998, the following exchange occurred regarding former trooper Burker's purported testimony and allegations concerning Helen's suitability as a permanent guardian of Kia:

COUNSEL FOR TAMMY: I would like to add too I have a witness, Ginger Burker, who's here and helped file the petition. And Dr. Wexler I don't believe is aware of that and would have an influence on his opinion. I would like for some ability to—him to hear her testimony or have her testify.
THE COURT: Don't we have a recitation of those facts somewhere? I know we dealt with one earlier.
. . . .
THE COURT: Dr. Wexler, were you familiar with the family protection action that was filed against [Helen]?
DR. WEXLER: Actually that she [Tammy] had initiated the order from jail one way or another. It was my understanding that the allegations she made were not substantiated.
. . . .
COUNSEL FOR TAMMY: And I think it's of a concern that there were allegations made and the department did not look into it.
THE COURT: I think the department did look into them.
. . . .
COUNSEL FOR TAMMY: The mother is still concerned about the welfare of this child. That's why she filed the original FPA. They need and deserve to be investigated.
THE COURT: They're undertaking it.
COUNSEL FOR TAMMY: Whether or not those concerns should be taken into consideration by the department and whether it is the right placement for the child.
THE COURT: The department knows of them and I'm sure they're cognizance of them and

known to the trial court.[18]

■ Tammy lastly argues that Syllabus point 3 of *Michael M.* requires that Kia be placed for adoption. It is clear from Syllabus point 3 of *Michael M.* that priority is to be given to securing a suitable adoptive home, and a circuit court should consider other placement alternatives "only where the court finds that adoption would not provide custody, care, commitment, nurturing and discipline consistent with the child's best interests . . . ." The record is abundantly clear that the court, in this instance, considered adoption and found that "adoption *would not* provide custody, care, commitment, nurturing and discipline consistent with the child's best interests." Id. (emphasis added). The only adoptive home available for Kia, with the possible exception of her grandmother Helen,[19] was the Benedict family. There is nothing in the record to indicate that the Benedicts had any type of relationship with Kia. Their relationship was with Kia's mother, Tammy.

In direct contrast, the trial court found that it was in the child's best interests to be placed into permanent foster care with her grandmother, Helen. There is a distinct difference between foster care with grandparents and foster care with a nonrelative. In fact, Kia's grandmother had consistently provided custody, care, commitment, nurturing and discipline to Kia throughout her life. The only limited time wherein Helen did not provide such care to Kia was as a direct result of Tammy having Kia removed from Helen's care. Thus, it is evident that the trial court did, in fact, consider and properly apply the directives set out in Syllabus point 3 of *Michael M.* Having done so, the trial court found that "adoption would not provide custody, care, commitment, nurturing and discipline consistent with the child's best interests" and therefore ordered a different placement alternative. As such, the circuit court properly ordered the permanent guardianship of Kia to be with the DHHR and the child's physical placement to be with Helen.[20]

will probably keep them in their home study. There's nothing that the department didn't know about. Now it's their determination—they have to consider all of that when they make their determination.

18. While the record clearly demonstrates the trial court's knowledge of the evidence Tammy proposed to present, we nonetheless observe that none of the actual evidence from which the trial court derived its knowledge, which evidence had been previously introduced during the criminal prosecutions of Tammy and Mark and in relation to the family violence petition that was filed against Helen by Tammy, was included in the record of this action. In a similar context involving supervised parental visitation in connection with a divorce action, we held that if the transcript from a criminal case is used to determine that credible evidence of sexual abuse by a parent does or does not exist, "the transcript must be made a part of the record in the civil proceeding so that this Court, where appropriate, may adequately review the civil record to conclude whether the lower court abused its discretion." Syl. pt. 2, *Mary D. v. Watt*, 190 W.Va. 341, 438 S.E.2d 521 (1992). Although the *Mary D.* case dealt with allegations of sexual abuse, its principles are applicable in the instant matter. In order for this Court to provide meaningful review in future cases, we believe the better practice is for a trial court to include all evidence on which it bases its decision as a part of the record. However, because the specific allegations against

Helen and the prior evidence relating thereto are otherwise evident in the existing record, the trial court's omission of the relevant portions of the records from the earlier proceedings does not justify reversal on that basis.

19. *See supra* note 12.

20. The circuit court clearly determined that adoption by the Benedicts would not provide Kia with the "custody, care, commitment, nurturing and discipline consistent" with her best interests. While we conclude that the circuit court properly placed Kia in permanent foster care with her grandmother, we note that the preferred disposition under Syllabus point 3 of *State v. Michael M .*, 202 W.Va. 350, 504 S.E.2d 177 (1998), would be for Kia's grandmother to take the affirmative step of adopting Kia. The West Virginia Legislature has similarly taken steps to "expressly encourage foster parents who develop emotional ties to the children for whom they care to adopt those children." *State ex rel. Treadway v. McCoy*, 189 W.Va. 210, 213, 429 S.E.2d 492, 495 (1993) (citation omitted). By virtue of W. Va. Code § 49–2–17(a) (1998) (Repl.Vol.1998), the Legislature has provided for subsidized adoptions of eligible children under certain circumstances such as where the child has "established emotional ties with prospective adoptive parents . . . while in their care." W. Va.Code § 49–2–17(a) (1998) (Repl.Vol.1998).

## IV.

### CONCLUSION

In view of the foregoing, the July 14, 1998, order of the Circuit Court of Jefferson County, placing Kia in permanent foster care with her paternal grandmother, is affirmed.

Affirmed.