**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

*In re* **C.P.-1 and I.P.**

**No. 21-0105** (Preston County 19-JA-8 and 19-JA-9)

**MEMORANDUM DECISION**

Petitioner Mother C.P.-2, by counsel Kristen D. Antolini, appeals the Circuit Court of Preston County's January 4, 2021, order adjudicating her as an abusive and neglectful parent in regard to C.P.-1 and I.P.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey and Katherine A. Campbell, filed a response in support of the circuit court's order. The guardian ad litem, John C. Rogers, filed a response on behalf of the children in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in adjudicating her of abuse and neglect.[2]

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990). Additionally, because one of the children and the mother share the same initials, we will refer to them as C.P.-1 and C.P.-2, respectively, throughout this memorandum decision.

[2]Petitioner briefly raises a second assignment of error in which she alleges that the circuit court failed to inquire if she wished to appeal her adjudication. Petitioner is correct that West Virginia Code § 49-4-601(k) requires that "[f]ollowing the court's [adjudicatory] determination, it shall ask the parents or custodians whether or not appeal is desired." However, petitioner fails to allege how she was prejudiced by the court's failure, nor does she provide evidence to establish any such prejudice. On the contrary, petitioner appealed from the circuit court's January 4, 2021, order adjudicating her of abuse and neglect. As such, petitioner cannot establish entitlement to relief as the court's failure to strictly comply with West Virginia Code § 49-4-601(k) constitutes harmless error. *See Tennant v. Marion Health Care Found., Inc.*, 194 W. Va. 97, 111, 459 S.E.2d 374, 388 (1995) ("Under West Virginia law, when substantial rights are not affected, reversal is not appropriate.").

1

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In January of 2019, the DHHR filed an abuse and neglect petition alleging that petitioner exposed the children to emotional, psychological, and/or physical abuse and neglect. According to the petition, petitioner and the father were engaged in a contentious custody battle over the children, and petitioner instructed the children to lie about the father physically and sexually abusing them. After discovering that C.P.-1 admitted to lying about the father abusing her, petitioner demanded the child exit her vehicle, which the child refused to do. Petitioner then sped off, threw the child's antidepressant medication from the vehicle, and told her she did not need it. Shortly thereafter, petitioner forced the child to exit the vehicle and retrieve the medication. The DHHR further alleged that petitioner incentivized the children to fabricate allegations against the father. Specifically, if the children wanted something, like a candy bar, petitioner would ask them questions about whether petitioner had "done anything to them or ha[d] been mean to them." Reportedly, this behavior caused the children to make false allegations in order to be rewarded by petitioner.

DHHR personnel interviewed then-eleven-year-old C.P.-1 at school, during which the child described petitioner "going crazy" after I.C. told petitioner that C.P.-1 informed their father about petitioner asking C.P.-1 to "tell the counselor that Dad hit you upside the head." The child told the DHHR worker that she did not want petitioner to know about her disclosing this incident because petitioner would "flip out on her." C.P.-1 also was clear that her past allegations regarding the father were untrue and that he never touched her and was not mean to her. She asserted that she felt like she was "addicted to lying" because petitioner "keeps telling me to lie about my Dad." This included petitioner instructing the child to post on social media about being sexually assaulted. The child also disclosed that petitioner would talk to her about the father's sex life with inappropriate specificity and once engaged in a physical altercation with the father's girlfriend at a baseball game. DHHR personnel also spoke to then-nine-year-old I.C., who reportedly preferred living with petitioner because she "get[s] whatever [she] want[s]" from petitioner. DHHR personnel asked I.C. "if everything was good at the [petitioner's] house," to which I.C. responded, "[petitioner] doesn't coach us."

The DHHR also spoke with Liz Smailes, the children's counselor who had been treating the children for over one year. According to Ms. Smailes, C.P.-1 disclosed that petitioner instructed the children to say negative things about the father and that C.P.-1 felt as if "a weight had been lifted off of her by finally admitting this" because she no longer wanted to lie about her father. C.P.-1 also disclosed to Ms. Smailes that petitioner became upset at C.P.-1 for not telling lies shortly before Christmas, resulting in petitioner buying I.C. "a lot more Christmas presents, including an ATV." Ms. Smailes stated that C.P.-1 had been disclosing suicidal ideations over the prior months and was prescribed Prozac. In her professional opinion, Ms. Smailes believed that the C.P.-1's problems were caused by petitioner requiring the child to fabricate allegations

against the father. Ms. Smailes indicated that I.C. was more guarded in therapy, although she opined that I.C. was also coached to make disclosures about the father.

According to the DHHR, petitioner blamed the children's behavior on alleged sexual abuse that occurred at the father's home and indicated that C.P.-1 reported she would kill herself if she had to return to the father's home. The DHHR also interviewed the father, who reported that petitioner made up allegations against him, including filing multiple petitions for domestic violence protective orders that were all ultimately dismissed. The DHHR's petition contained no allegations against the father.

Given the detailed facts and the various medical experts and records at issue, the court held a series of adjudicatory hearings between February of 2019 and October of 2020. During one hearing in April of 2019, petitioner addressed the court and made additional allegations against the father, claiming that he previously physically and sexually abused the children. Based on these allegations, the court threatened to remove the children from the father's care and place them in a foster home. However, both the guardian and the DHHR objected to the children's removal so the court permitted them to stay with the father.

In July of 2019, the court conducted in camera interviews with the children after the parties submitted proposed questions for them. During her interview, C.P.-1 disclosed that she was afraid of petitioner because petitioner screamed at her, petitioner would frequently ask her to lie about her father sexually abusing her, and she wanted petitioner to participate in therapy to become stable. The child also confirmed the allegation that petitioner threw her antidepressants from a moving vehicle and forced her to retrieve them from alongside the highway. I.P. also confirmed the incident regarding the medication but stated that she wished to live with petitioner.

At a hearing in September of 2019, Dr. Traci Berry-Harris testified that she conducted psychological evaluations on the children. According to Dr. Berry-Harris, C.P.-1 denied physical or sexual abuse by her father and again disclosed that petitioner instructed her to lie about the alleged incidents. Dr. Berry-Harris testified that C.P.-1 appeared credible during her evaluation. According to the witness, C.P.-1 was diagnosed with generalized anxiety disorder with depressed mood and I.P. was diagnosed with depressed mood. The witness further explained that the children have different perceptions of the incidents and of petitioner's motives.

At an adjudicatory hearing in December of 2019, Elizabeth Smailes, the children's therapist, testified that C.P.-1 told her that the allegations against her father were untrue. According to Ms. Smailes, C.P.-1 "was finally getting relief by telling the truth" and appeared to be a "new person." According to Ms. Smailes, petitioner's continued emotional abuse of the child caused her mental health to deteriorate to the point that C.P.-1 suffered from hallucinations. The child also reportedly contemplated suicide, which Ms. Smailes attributed to extreme emotional stress.

Petitioner testified at a hearing in December of 2019, at which time she confirmed that she did not raise concerns of abuse by the father during their divorce proceedings. She also stated that C.P.-1 was a liar, which she had just realized that as a result of these proceedings. According to petitioner, she was "never . . . emotionally or mentally abusive to [her] children." Petitioner

also indicated that she did not believe that her conduct caused C.P.-1 to contemplate suicide. Petitioner further acknowledged that she filed four separate petitions for protective orders against the father, all of which were dismissed. Finally, petitioner testified that she was never made aware of multidisciplinary team ("MDT") meetings which she did not attend; however, the court noted that petitioner's counsel had previously stated on the record that she provided petitioner notice of the meetings.

At an adjudicatory hearing in February of 2020, the guardian informed the court that I.P. recently disclosed to him that petitioner asked her to lie about her father and that she wished for the proceedings to be over. Petitioner then called witnesses who testified that they never heard her coach the children to make allegations, although at least one witness acknowledged that petitioner was often alone with the children and had the opportunity to coach them. Petitioner's boyfriend testified that C.P.-1 alleged that her father would punish her for making allegations against him. The children's babysitter also testified that the children told her that they were scared to go to the father's home. Petitioner called the children's school principal to testify. According to the principal, petitioner would frequently travel to the school to report allegations of sexual abuse allegedly perpetrated by the father, but he indicated that neither child ever corroborated these allegations. Petitioner also called as a witness an individual who performed a polygraph examination on her. Although this witness ultimately concluded that petitioner was not deceitful in her assertion that she did not coach the children, the court noted its skepticism based on different outcomes for the same question during the examination.

In October of 2020, the court held a status hearing so that it could announce its findings of fact and conclusions of law concerning adjudication. Based on the evidence, the court found that the DHHR established by clear and convincing evidence that petitioner abused and neglected the children.[3] It is from the adjudicatory order that petitioner appeals.

The Court has previously established the following standard of review:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been

---

[3]Subsequent to her adjudication, the court granted petitioner disposition under West Virginia Code § 49-4-604(c)(5) upon the agreement of all parties, including the guardian for the children. According to the parties, the children's permanency plan is to remain in the legal and physical custody of the nonabusing father. Petitioner enjoys visitation with the children at the father's discretion.

committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner alleges only that the circuit court erred in adjudicating her of abuse and neglect of the children. Petitioner's argument on appeal cannot entitle her to relief, however, because she focuses only on the testimony of one witness and ignores the voluminous evidence that the circuit court heard in support of adjudication over a period of twenty months and multiple hearings. Indeed, petitioner would have this Court overturn the circuit court's detailed findings as to her adjudication simply because Dr. Berry-Harris deferred her diagnosis of Child Psychological Abuse in regard to both children. We find this insufficient to overturn the circuit court's adjudication, because a formal psychological diagnosis is in no way required to find that a child has been abused or neglected.

According to West Virginia Code § 49-1-201, an "abused child" is one "whose health or welfare is being harmed or threatened by . . . [a] parent . . . who knowingly or intentionally inflicts, attempts to inflict, or knowingly allows another person to inflict, physical injury *or mental or emotional injury*, upon the child *or another child in the home*." (Emphasis added). In arguing that Dr. Berry-Harris deferred a diagnosis of Child Psychological Abuse, petitioner ignores testimony from Ms. Smailes in which the therapist emphatically concluded that "C.P.[-1] and I.P. have been emotionally abused and manipulated by [petitioner] and as a result this has caused a gradual deterioration of the mental state of C.P.-1 specifically." The therapist further concluded that it was not until C.P.-1 admitted to petitioner's abuse "that she was able to stabilize and no longer present as traumatized, agitated[,] and severely depressed." Further, the court heard evidence from multiple sources, including the child herself, that C.P.-1 fabricated the allegations against her father at petitioner's direction. While petitioner points to Dr. Berry-Harris's testimony that it could be possible the child did, in fact, tell petitioner she was abused, the question of whether the court erred in discounting this possibility in favor of the ample evidence that the child admitted to petitioner requiring her to make these allegations is a credibility determination that we decline to disturb on appeal. *Michael D.C. v. Wanda L.C.*, 201 W. Va. 381, 388, 497 S.E.2d 531, 538 (1997) ("A reviewing court cannot assess witness credibility through a record. The trier of fact is uniquely situated to make such determinations and this Court is not in a position to, and will not, second guess such determinations."). In short, the record contains extensive, clear evidence that petitioner required the children to make these disclosures and that her conduct had an extremely negative impact on C.P.-1.

As we have explained,

"[West Virginia Code § 49-4-601(i)], requires the [DHHR], in a child abuse or neglect case, to prove 'conditions existing at the time of the filing of the petition . . . by clear and convincing [evidence].' The statute, however, does not specify any particular manner or mode of testimony or evidence by which the

[DHHR] is obligated to meet this burden." Syllabus Point 1, *In Interest of S.C.*, 168 W.Va. 366, 284 S.E.2d 867 (1981).

Syl. Pt. 1, *In re Joseph A.*, 199 W. Va. 438, 485 S.E.2d 176 (1997) (citations omitted). Further,

> [a]t the conclusion of the adjudicatory hearing, the court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected . . . . The findings must be based upon conditions existing at the time of the filing of the petition and proven by clear and convincing evidence.

*In re F.S.*, 233 W. Va. 538, 544, 759 S.E.2d 769, 775 (2014). This Court has explained that "'clear and convincing' is the measure or degree of proof that will produce in the mind of the factfinder a firm belief or conviction as to the allegations sought to be established." *Id*. at 546, 759 S.E.2d at 777 (citation omitted). However, "the clear and convincing standard is 'intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases.'" *Id*. (citation omitted). Based on the evidence set forth above, which petitioner fails to address on appeal, it is clear that there was sufficient evidence to support the court's adjudication.

For the foregoing reasons, we find no error in the decision of the circuit court, and its January 4, 2021, order is hereby affirmed.

Affirmed.

**ISSUED**: October 1, 2021

**CONCURRED IN BY**:

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton

6