STATE OF WEST VIRGINIA

*In re* **R.J.-1, M.J., and T.J.**

**No. 18-0047** (Webster County 17-JA-10, 11, and 12)

**FILED**

**June 11, 2018**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Father R.J.-2, by counsel Christopher G. Moffatt, appeals the Circuit Court of Webster County's January 2, 2018, order terminating his parental rights to R.J.-1, M.J., and T.J.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel S.L. Evans, filed a response in support of the circuit court's order and a supplemental appendix. The guardian ad litem ("guardian"), Mary Elizabeth Snead, filed a response on behalf of the children also in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in adjudicating him as an abusing parent and terminating his parental rights without first granting him an improvement period.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In January of 2017, the DHHR filed a child abuse and neglect petition against petitioner and the mother.[2] The DHHR alleged that a Child Protective Services ("CPS") worker observed that R.J.-1 suffered from a severe medical condition which attacked his joints, muscles, and flesh and required regular and constant care in addition to normal care associated with good hygiene and regular feeding. According to the DHHR, the child did not appear to be fed, cleaned, or medicated regularly. The DHHR reported that then three-year-old M.J. had no speech or ability to articulate words, was not potty-trained, and appeared to have no socialization or human interaction skills that would be normal for a child of her age. The CPS worker found M.J. in her bedroom, which had a broken door handle and rendered the child unable to open the door from

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W.Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W.Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W.Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W.Va. 641, 398 S.E.2d 123 (1990). Additionally, because a child and petitioner share the same initials, we will refer to them as R.J.-1 and R.J.-2, respectively, throughout this memorandum decision.

[2]Petitioner is the biological father of M.J. and T.J., and the stepfather of R.J.-1.

the inside, essentially locking her in the room. The DHHR also alleged that the home was extremely cluttered and dirty, with trash scattered about the home. Dog food and animal feces littered the floors and the toilet was covered in human feces. Medication and sharp objects were strewn throughout the floors and within reach of the children. A screw was observed in then two-month-old T.J.'s crib. The mother stated that M.J. had only been in her room for approximately thirty minutes and that she sometimes put the child in the room with the broken door handle because she was "hard to handle." After observing the condition of the home, the DHHR took custody of the children.

The DHHR further alleged that, the following day, R.J.-1's physical therapist opined that elements of his therapy and treatment were being ignored on a regular basis at home, resulting in the lack of medication for his skin condition and the disuse of a special chair for his muscles, bones, and posture. The child was subsequently admitted to Summersville Regional Medical Center, in Summersville, West Virginia. The child was diagnosed with failure to thrive and transferred to Ruby Memorial Hospital in Morgantown, West Virginia. There, the child was diagnosed with Familial Mediterranean Fever[3] ("FMF"), severe malnutrition, dehydration, necrosis, open wounds to his body, child neglect, a feeding tube that was visibly soiled with animal feces, and various other medical conditions. The then five-year-old child only weighed twenty-two pounds upon admission and had to undergo a procedure to replace his feeding tube. The petition further indicated that the child had last been seen regarding his feeding tube in April of 2016. The child was scheduled for a follow-up three months later, but the parents did not keep the appointment. In sum, the DHHR alleged that the parents were unable to provide a safe, clean home and were unable to provide the children with adequate medical care and treatment in a regular and timely manner.

The circuit court held a preliminary hearing in February of 2017. In September of 2017, the circuit court held an adjudicatory hearing wherein it heard the testimony of several witnesses regarding R.J.-1's medical condition. An inpatient pediatrician from West Virginia University Children's Hospital testified that R.J.-1 was admitted to the hospital in January of 2017 with several diagnoses including a chronic skin disorder and malnourishment, as well as for his own protection due to unsafe conditions in the home.[4] The pediatrician testified that the child only weighed twenty-two pounds at the time and had not gained any weight in seventeen months,

---

[3]"Familial Mediterranean Fever . . . is an inherited disease, characterized by recurrent attacks of fever, inflammation of the abdominal lining (peritonitis), inflammation of the lining surrounding the lungs (pleurisy), painful, swollen joints (arthralgia and occasionally arthritis), and a characteristic ankle rash. This condition is also sometimes referred to as recurrent polyserositis or familial paroxysmal polyserositis."

Learning About Familial Mediterranean Fever, https://www.genome.gov/12510679/learning-about-familial-mediterranean-fever/, (last visited May 3, 2018).

[4]FMF had previously been diagnosed, but the pediatrician testified that a dermatologist treating R.J.-1 considered this diagnosis inconsistent with the child's symptoms. While FMF was not ruled out as a diagnosis, the pediatrician treated the child's illness as undiagnosed.

despite having a functional feeding tube. The pediatrician described the child as a "bag of bones" at that time, and noted that he had numerous scars and pressure sores from not being moved. Additionally, he testified that the child's "nose was pretty much nonexistent, and he had some sores on his face." The child also had joint contractures, which left his joints in a flexed position, and he was unable to use his hands. Regarding treatment, the pediatrician testified that the child gained weight while in the hospital, which demonstrated that there were no health issues preventing him from gaining weight, but rather a lack of nutrition. While it was clear the child had an underlying disease, the pediatrician testified that lack of nutrition likely worsened the child's symptoms. The pediatrician opined that had the child not been admitted to the hospital at that time, he likely would have died within the week.

R.J.-1's primary care physician testified that, as of August of 2017, following removal from petitioner's care, the child weighed forty pounds and his joint contractures had greatly improved. The physician testified that she agreed with the pediatrician's opinions and noted that as soon as the child received therapy and nutrition, he "made a complete turnaround." The DHHR then presented the testimony of R.J.-1's former pediatrician, who treated him from infancy until the child was around three years old. The child's former pediatrician testified that the mother had problems with following through with treatment or appointments. In fact, he testified that he reported to the mother that "[R.J.-1] was falling into medical neglect here because [the parents] couldn't get him to his appointments" and whether due to financial means or abuse, he suggested that CPS be called to help care for the child. The pediatrician testified that he did not see R.J.-1 again after that conversation.

M.J.'s foster parent also testified. She stated that when M.J. first came to her home, she could not speak or communicate. She testified that the child barked like a dog and babbled. The child also ran on all four extremities and tried to drink water out of the toilet. Since being in the foster home, the foster parent testified that M.J. learned words and had been enrolled in school. However, the foster parent stated that after attending visitation with the parents, M.J. would begin walking on all four extremities again.

After hearing evidence, the circuit court found that the parents did not have a fit and suitable home and failed to provide appropriate food, medical care, and nutrition to R.J.-1 for an extended period of time. The circuit court noted that although R.J.-1 had a serious medical condition, the parents were nevertheless neglectful in his medical care as the child's weight and mobility significantly improved with proper treatment and nutrition after being removed. Accordingly, the circuit court adjudicated the parents as abusing parents.

The DHHR held a dispositional hearing in November of 2017 wherein a CPS worker testified that the parents failed to express understanding regarding the circumstances of abuse and neglect. The CPS worker testified that the parents indicated they understood that they needed to clean their home, but alleged that they did everything they were told to do regarding R.J.-1's medical care. The CPS worker stated that despite participating in adult life skills and parenting classes, the parents still failed to acknowledge the issues relating to R.J.-1's medical problems and nutrition. Petitioner then testified and requested an improvement period. Petitioner acknowledged that the home was unfit and stated that he would participate in any services granted to him. Petitioner denied that he failed to feed R.J.-1, but admitted that the child's

condition had deteriorated. Due to his work schedule, petitioner stated that he only fed R.J.-1 through his feeding tube approximately two times and that the mother usually fed the child. When petitioner was asked what he did wrong in taking care of the children, he responded,

> Like I said, whatever's recommended, we'd do to improve, but as far as what we was being told to do, we was doing everything recommended for us to do and, if there was something that we was doing wrong, I'm more than willing to fix it, so we can get the kids back and do better.

However, petitioner could not explain why the child's weight nearly doubled in the time since he had been removed from the home. After hearing evidence, the circuit court noted that it was not required to exhaust every speculative possibility for rehabilitation, found that there was no reasonable likelihood that petitioner could correct the conditions of abuse in the near future, and concluded that termination was necessary for the children's welfare. It is from the January 2, 2018, dispositional order terminating his parental rights to the children that petitioner appeals.[5]

The Court has previously established the following standard of review in cases such as this:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W.Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner argues that the circuit court erred in adjudicating him as an abusing parent. Specifically, petitioner argues that he was able to remedy the dirty conditions in the home by cleaning it. Further, he argues that he sought treatment for R.J.-1, followed the advice of doctors, and sought second opinions as to his medical condition. According to petitioner, the fact that R.J.-1's weight nearly doubled in the seven months between being removed from the home and the adjudicatory hearing does not establish that he medically neglected the child. We disagree.

---

[5]The mother's parental rights were terminated below. D.B., R.J.-1's biological father, voluntarily relinquished his parental rights below. The children have been placed in foster homes and the permanency plan is adoption therein.

4

> "W.Va.Code [§] 49-6-2(c) [now West Virginia Code § 49-4-601(i)], requires the [DHHR], in a child abuse or neglect case, to prove 'conditions existing at the time of the filing of the petition . . . by clear and convincing [evidence].' The statute, however, does not specify any particular manner or mode of testimony or evidence by which the [DHHR] is obligated to meet this burden." Syllabus Point 1, *In Interest of S.C.*, 168 W.Va. 366, 284 S.E.2d 867 (1981).

Syl. Pt. 1, *In re Joseph A.*, 199 W.Va. 438, 485 S.E.2d 176 (1997) (citations omitted). This Court has explained that "'clear and convincing' is the measure or degree of proof that will produce in the mind of the factfinder a firm belief or conviction as to the allegations sought to be established." *In re F.S.*, 233 W.Va. 538, 546, 759 S.E.2d 769, 777 (2014) (citing *Brown v. Gobble*, 196 W.Va. 559, 564, 474 S.E.2d 489, 494 (1996)). However, "the clear and convincing standard is 'intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt in criminal cases.'" *In re F.S.*, 233 W.Va. at 546, 759 S.E.2d at 777 (quoting *Cramer v. W.Va. Dep't of Highways*, 180 W.Va. 97, 99 n.1, 375 S.E.2d 568, 570 n.1 (1988)).

> Pursuant to West Virginia Code § 49-1-201, a neglected child is one
>
> [w]hose physical or mental health is harmed or threatened by a present refusal, failure or inability of the child's parent . . . to supply the child with necessary food, clothing, shelter, supervision, medical care or education, when that refusal, failure or inability is not due primarily to a lack of financial means on the part of the parent, guardian or custodian[.]

After reviewing the record, we find that sufficient evidence existed upon which to adjudicate petitioner as an abusing parent. The inpatient pediatrician who attended to R.J.-1 during his hospital stay testified that the child was near death at the time of his removal from the home and would have died within the week had he not been admitted to the hospital. Testimony established that the child had not gained weight in seventeen months and only weighed twenty-two pounds at five years old. What appeared to be animal feces was in the child's feeding tube. Moreover, the child had sores and lesions all over his body such that his nose had nearly completely deteriorated. While petitioner argues that the child's undiagnosed illness largely contributed to his poor health at the time of removal, the expert testimony of the pediatrician established that the illness did not prevent the child from growing. Several times throughout this testimony, the pediatrician stated "if you feed him, he will grow[.]" In fact, the child's weight nearly doubled in the seven months following his removal from petitioner's care. The pediatrician and the primary care physician both testified that while R.J.-1 would have had problems with his skin regardless of his caloric intake, lack of nutrition certainly attributed to the severity of his sores and lesions and his health in general. Regarding the other children, the evidence established that three-year-old M.J. could not speak, barked like a dog, ran on all four extremities, and had no human interaction or socialization skills, and a loose screw was found in two-month-old T.J.'s crib. As such, we find that the record demonstrates that the children were abused and/or neglected and that the circuit court properly adjudicated petitioner as an abusing parent based upon clear and convincing evidence.

Petitioner also argues that the circuit court erred in terminating his parental rights without first granting him an improvement period. Specifically, petitioner argues that he was compliant with the services offered to him, which demonstrated that he would have fully participated in an official improvement period. However, we find that petitioner's argument is without merit. The decision to grant or deny an improvement period rests in the sound discretion of the circuit court. *See In re M.M.*, 236 W.Va. 108, 115, 778 S.E.2d 338, 345 (2015) ("West Virginia law allows the circuit court discretion in deciding whether to grant a parent an improvement period."); Syl. Pt. 6, in part, *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996) ("It is within the court's discretion to grant an improvement period within the applicable statutory requirements."). We have also held that a parent's "entitlement to an improvement period is conditioned upon the ability of the [parent] to demonstrate 'by clear and convincing evidence, that the [parent] is likely to fully participate in the improvement period. . . .'" *In re Charity H.*, 215 W.Va. 208, 215, 599 S.E.2d 631, 638 (2004).

We note that while petitioner was not granted a formal improvement period, he was provided with several services during the underlying proceedings including adult life skills classes, parenting classes, and drug screens. However, the CPS worker testified that, while petitioner complied with adult life skills and parenting classes, he failed to recognize his wrong-doing regarding R.J.-1's lack of nutrition. During his testimony at the dispositional hearing, petitioner could not even elaborate on what he had done wrong, stating "we was doing everything recommended for us to do and, if there was something that we was doing wrong, I'm more than willing to fix it. . . ." Further, the CPS worker's testimony established that CPS exhausted its resources and could not offer any other services which would help petitioner recognize the severity of R.J.-1's medical neglect. We have previously held that

> [i]n order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense.

*In re Timber M.*, 231 W.Va. 44, 55, 743 S.E.2d 352, 363 (2013) (quoting *In re Charity H.*, 215 W.Va. at 217, 599 S.E.2d at 640). Because petitioner failed to acknowledge how his actions constituted abuse and/or neglect of the children, an improvement period was rendered futile. Accordingly, we find that the circuit court did not err in denying him the same.

Moreover, we find that the circuit court did not err in terminating petitioner's parental rights. Pursuant to West Virginia Code § 49-4-604(b)(6), circuit courts are directed to terminate parental rights upon findings that there is no reasonable likelihood the conditions of abuse and neglect can be substantially corrected in the near future and when necessary for the children's welfare. West Virginia Code § 49-4-604(c)(3) clearly indicates that a situation in which there is no reasonable likelihood the conditions of abuse and neglect can be substantially corrected includes one in which

[t]he abusing parent . . . [has] not responded to or followed through with a reasonable family case plan or other rehabilitative efforts of social, medical, mental health or other rehabilitative agencies designed to reduce or prevent the abuse or neglect of the child, as evidenced by the continuation or insubstantial diminution of conditions which threatened the health, welfare or life of the child. . . .

The record demonstrates that there was sufficient evidence upon which to terminate petitioner's parental rights. As mentioned above, testimony established that petitioner was provided with adult life skills and parenting classes, but failed to recognize the extent of the abuse perpetrated against the children. R.J.-1 was near death when he was removed from the home and petitioner continued to maintain at the dispositional hearing that he was caring for the child as directed. As such, he was unable to successfully follow through with the services provided and correct the conditions of abuse. While petitioner argues that he should have been granted an improvement period prior to the termination of his parental rights, we have previously held that

"[t]ermination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, W. Va. Code [§] 49-6-5 [now West Virginia Code § 49-4-604] . . . may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under W. Va. Code [§] 49-6-5(b) [now West Virginia Code § 49-4-604(c) ] . . . that conditions of neglect or abuse can be substantially corrected." Syllabus point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 5, *In re Kristin Y.*, 227 W.Va. 558, 712 S.E.2d 55 (2011). Having reviewed the record, we agree that there was sufficient evidence for the circuit court to find that there was no reasonable likelihood that petitioner could correct the conditions of abuse and neglect in the near future and termination was necessary for the children's welfare. As mentioned above, circuit courts are directed to terminate parental rights upon such findings.

For the foregoing reasons, we find no error in the decision of the circuit court, and its January 2, 2018, order is hereby affirmed.

Affirmed.

**ISSUED**: June 11, 2018

**CONCURRED IN BY**:

Chief Justice Margaret L. Workman
Justice Robin Jean Davis
Justice Menis E. Ketchum
Justice Elizabeth D. Walker

Justice Loughry, Allen H., II suspended and therefore not participating.

7