# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

*In re* **D.H.-1 and M.H.**

**No. 17-0953** (Hampshire County 16-JA-74 and 75)

## MEMORANDUM DECISION

Petitioner Mother M.M., by counsel Gail V. Lipscomb, appeals the Circuit Court of Hampshire County's September 22, 2017, order terminating her custodial rights to D.H.-1 and M.H.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Lee Niezgoda, filed a response in support of the circuit court's order. The guardian ad litem ("guardian"), Joyce E. Stewart, filed a response on behalf of the children in support of the circuit court's order. Respondent Father D.H.-2, by counsel Julie A. Frazer, also filed a response in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in ratifying the DHHR's emergency removal of the children from her care, finding that the allegations contained in the petition were proven by clear and convincing evidence, making its findings of fact and conclusions of law, failing to conform to the rules of evidence, making findings of fact and conclusions of law regarding issues not contained in the petition and based upon improper personal bias, and terminating her custodial rights.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

Petitioner and the father were married in August of 2002 and had two children during the course of their marriage; D.H.-1, now age ten, and M.H., now age fourteen. The couple divorced in November of 2014. During divorce proceedings, petitioner was granted primary residential

---

[1] Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W.Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W.Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W.Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W.Va. 641, 398 S.E.2d 123 (1990). Additionally, because one of the children and the father share the same initials, we will refer to them as D.H.-1 and D.H.-2, respectively, throughout this memorandum decision.

1

parenting status and the father was granted limited supervised visitation.[2] Thereafter, petitioner and the father continued to experience a great deal of conflict in their relationship. In 2015, the father filed a petition for contempt against petitioner, alleging that she prevented him from having visits with the children. Following a hearing on the matter, the circuit court modified the father's visitation but did not make a finding of contempt against petitioner. Later in 2015, petitioner filed a contempt petition against the father alleging that he was not exercising his visitation. In response, the father filed a counter-petition alleging that petitioner had moved the children into the home of her boyfriend, a registered sex offender. As a result, the circuit court appointed a guardian for the children and, in January of 2016, issued an order adopting the guardian's recommendations for the parents.[3]

In August of 2016, the DHHR filed the instant child abuse and neglect petition against petitioner alleging that she emotionally abused the children by causing them to believe that they might have been inappropriately touched by the father and by attempting to have D.H.-1 committed to a psychiatric placement against the child's best interests. Specifically, the DHHR stated that it began investigating the matter earlier in August of 2016, when it received a referral that D.H.-1 had become increasingly aggressive against others, attempted to jump out of her window, and attacked her dog. The caller leaving the referral indicated that the father had been rubbing and touching D.H.-1's vaginal area, that the child reported being upset, and that she stated she was not supposed to tell anyone or her father would kill her. The caller also stated that, according to petitioner, the child was often sick and upset after visits with the father. Further, the caller alleged that the child's vaginal area was red following visits with the father. Finally, the caller noted that the child had been admitted to the hospital the day prior. A temporary safety plan was put in place and forensic interviews with the children were scheduled.

During its investigation, the DHHR learned that D.H.-1 had been admitted to Brook Lane Hospital and was expected to be there five to seven days. A DHHR worker contacted D.H.-1's therapist at the hospital and learned that, upon admitting the child, petitioner disclosed that the child had been inappropriately touched by the father. However, the DHHR alleged that the child denied being touched inappropriately to hospital staff and did not exhibit any of the behaviors for which she was admitted. The child was diagnosed with attention deficit hyperactivity disorder ("ADHD") and disruptive mood dysregulation disorder. After being discharged from Brook Lane Hospital, the child received follow-up care from Chestnut Ridge Hospital and was diagnosed with adjustment disorder in the context of a high conflict divorce.

---

[2]During the underlying proceedings, the guardian proffered that she investigated allegations of sexual abuse made by petitioner against the father during the divorce proceedings, but found no evidence to support the allegations. As a result, the guardian recommended that the father be granted supervised visitation at that time in order to protect him against future allegations.

[3]The guardian recommended that the parents have a shared parenting arrangement wherein petitioner had the primary residence of the children. The guardian further recommended that the father's supervised visitation continue and that it be increased.

The petition further alleged that petitioner reported to the DHHR office and requested information regarding the children's interviews. While there, petitioner informed a DHHR worker that D.H.-1's doctor believed she was bipolar and had ADHD, and explained why the child had been in the hospital. According to petitioner, D.H.-1's behavior escalated and she contacted a psychiatrist to request assistance and then, per the psychiatrist's recommendation, she attempted to have the child admitted to a mental health hospital. Petitioner told the DHHR worker that the child previously reported that the father "plays with her leg, etc." and that it upset the child. Petitioner also told the DHHR worker that the father previously bruised M.H. but that the family court did not attribute it to the father. The petition alleged that, during the latter part of petitioner's meeting with the DHHR worker, M.H. entered the room and began reporting abuse perpetrated against petitioner by the father. When the DHHR worker asked the child if she had witnessed the abuse, she stated "no, mommy told me all about it."

Subsequently, both children underwent "Finding Words" interviews. M.H. denied being touched inappropriately. Throughout the interview the child reported things that she was "supposed" to tell the interviewer. For example, M.H. told the interviewer that she was "supposed to tell you that I was red down there (pointing towards vaginal area) from the time I was two until I was [eight]." According to the petition, she also reported that petitioner had told her things to say during the interview the previous night and during lunch that day, and kept repeating throughout the interview "I'm telling the truth, I'm an honest girl." Further, M.H. again reported abuse perpetrated by the father against petitioner, but admitted that she had not witnessed the events, but only learned of them through petitioner. The child also reported D.H.-1's aggressive behaviors, but admitted that she had not witnessed them and stated that her mother told her about them. Regarding D.H.-1's interview, the child reported that she was sent to the hospital for being mean to her family. D.H.-1 denied being inappropriately touched by her father but did report that he once rubbed her leg and that she did not like it. D.H.-1 also denied attacking the dog, but admitted that she set it in the pool because it was hot and panting. Based upon these events, the DHHR concluded that petitioner was attempting to alienate the children from their father and was emotionally abusing them. During the course of the investigation, the children were placed with the father and petitioner was granted supervised visits. Thereafter, petitioner waived her preliminary hearing.

The circuit court held an initial adjudicatory hearing in October of 2016. The DHHR presented the testimony of several witnesses regarding the allegations contained in the petition. A DHHR worker testified that neither child reported sexual abuse and that M.H. appeared to have been coached to say things during her forensic interview. The DHHR worker contacted the staff at Brook Lane Hospital and testified that, after speaking to them, it was her impression that D.H.-1 was diagnosed and prescribed medication based, in part, on information provided by petitioner.

A victim's advocate from the local Child Advocacy Center ("CAC") testified that she spoke to petitioner on the day she brought M.H. in for her Finding Words interview. The advocate testified that she had to question petitioner several times about why M.H. was there because petitioner repeatedly talked about prior domestic violence issues with the father. Finally petitioner stated that earlier that year, the father began insisting that M.H. stay home with him while petitioner went to the store. Petitioner reported to the advocate that upon returning from

the store, M.H. would complain about her vagina being red and insist on showering despite having done so earlier in the day. The victim's advocate also testified that petitioner told her that D.H.-1 had been admitted to Brook Lane Hospital due to aggressive behavior. The advocate admitted that petitioner never specifically said that she believed the father had sexually abused the children. Thereafter, Amber Tally, a forensic interviewer and director of the CAC, testified that she interviewed the children and opined that M.H. had been coached to say certain things during the interview.

A law enforcement officer testified that petitioner had contacted him complaining of D.H.-1's unruly behavior. The officer testified that he gave the child a stern lecture on obeying petitioner, but stated that the child did not misbehave while he was at the home, nor did he see any behavior that would warrant hospitalization. Finally, the guardian proffered that she had previously investigated claims of sexual abuse during the family court divorce proceedings and stated that she did not find evidence of the same. However, she also stated that she did not find that petitioner was attempting to alienate the children from the father at that time.

Petitioner testified regarding the allegations against her. Regarding D.H.-1, petitioner stated that she attempted to seek medical treatment for her daughter because she was acting out, attempting to hurt others, and attempting to hurt herself. She stated,

> I had major concerns for what was going in [sic] my child because my child admitted to me after she had an out lash [sic] that night, she said, "The reason I'm scared of the dark is because Daddy came in my room in the old house and started rubbing on my leg and if Daddy [–] if I tell Daddy's secret, he'll kill my family."

Thereafter, the DHHR began questioning petitioner regarding allegations of sexual abuse by the father as set forth below:

Q.    Now, how many times have you made allegations of sexual abuse against the father?

A.     I've questioned what has happened. I've never said that he's sexually molested his daughter.

Q.    All right. How many times have you questioned what has happened?

A.    Through the entire [f]amily [c]ourt process and I have went to various professionals and [have] never gotten an answer.

Q.    After the [guardian] in the [f]amily [c]ourt case investigated the matter and found no findings of abuse - - or sexual abuse, it came up again, didn't it?

A.    Yes, it did because [M.H.] had - - had had a rash prior to our divorce when he had watched her privately when I had went to the store.

4

. . . .

Q. Do you believe that your child was sexually abused?

A. I believe something has happened, yes.

. . . .

Q. How many times have you suspected that this child has been sexually abused?

A. I believe something had happened on three different occasions before the divorce was signed.

. . . .

Q. Are you alleging that both children were sexually abused or just one?

A. I believe something has happened with [M.H.]. That's why I questioned if anything went on. But [D.H.-1] was the one that I was really questioned because she said that Daddy had came into her room and started rubbing on her leg and that she was scared.

Thereafter, petitioner's counsel questioned her regarding her allegations of abuse:

Q. [Petitioner], just so we're clear on this regarding your suspicions about possible –

A. Right.

Q. – you're not saying that any sexual abuse or assault occurred, but it's a possibility that it could have occurred because you have questions –

A. Right.

Q. – questions – you have questions.

A. Exactly.

After hearing testimony, the circuit court continued the adjudicatory hearing so that it could watch the recorded forensic interviews of the children. The hearing was reconvened in December of 2016, wherein the circuit court found that petitioner abused and/or neglected the children by subjecting them to severe emotional and psychological abuse. Specifically, the circuit court found that petitioner continued to allege that the father inappropriately touched the children despite such actions being unsubstantiated. Further, the circuit court found that

5

petitioner was attempting to have medical professionals hospitalize D.H.-1 to the detriment of the child. As such, the circuit court adjudicated petitioner as an abusing parent.

Over the course of the next few months, the matter was continued several times, twice due to petitioner retaining new counsel. In June of 2017, the circuit court held a dispositional hearing, wherein a psychologist testified on behalf of petitioner. The psychologist testified that he disagreed with a psychological evaluation of petitioner previously submitted by the DHHR because of certain testing methods used. The psychologist opined that documentation demonstrated that the child had acted in the manner described by petitioner and that petitioner acted in the way she did due to her past relationship with the father. The psychologist ultimately agreed with the DHHR's submitted psychological evaluation that petitioner needed therapy.

Thereafter, the circuit court continued the hearing, which was reconvened in June of 2017. Several witnesses testified as to petitioner's failure to acknowledge the conditions of abuse. A service provider testified that petitioner was offered parenting and adult life skills classes, but that the services were suspended due to petitioner's refusal to meaningfully attempt to schedule them. A DHHR worker then testified that because petitioner refused to acknowledge the conditions of abuse, further services would be useless. Petitioner also testified that she did not do anything wrong, but stated that she would provide adequately for her children's needs. After hearing evidence, the circuit court found that although petitioner's expert psychologist's opinion was that she needed therapy, petitioner failed to acknowledge the conditions of abuse and/or neglect. Without such acknowledgement, the circuit court concluded that the circumstances and deficiencies giving rise to the proceedings are effectively untreatable. As such, the circuit court found that termination of petitioner's custodial rights was in the best interests of the children. It is from the September 22, 2017, dispositional order that petitioner appeals.[4]

The Court has previously established the following standard of review:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record

---

[4]The children were placed with their nonabusing father and the permanency plan for the children is to remain in his care.

6

viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W.Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner first argues that the circuit court erred in ratifying the DHHR's emergency removal of the children. According to petitioner, the circuit court did not have a sufficient basis to determine that the children were in imminent danger warranting the removal of the children from her care. We disagree. The record is clear that petitioner voluntarily waived her right to a preliminary hearing, at which she would have had the opportunity to challenge the emergency removal. In fact, the record shows that the circuit court found that petitioner "freely, voluntarily, and with knowledge as to the rights she is waiving, has stated her wish to waive the preliminary hearing." The circuit court also found that imminent danger existed and that there was no reasonable, available, and less-drastic alternative to removal of the children. Petitioner did not object. As such, she has waived her right to raise this issue on appeal. *See State v. Jessie*, 225 W.Va. 21, 27, 689 S.E.2d 21, 27 (2009) ("This Court's general rule is that nonjurisdictional questions not raised at the circuit court level will not be considered to the first time on appeal."). Accordingly, we find that petitioner is entitled to no relief in this regard.

Petitioner's remaining assignments of error are heavily based upon her argument that the circuit court erred in finding that she accused the father of sexual abuse and wrongfully attempted to have her child admitted to the psychiatric hospital, and in adjudicating her as an abusing parent based upon the same.[5]

> "W.Va. Code [§] 49-6-2(c) [now West Virginia Code § 49-4-601(i)], requires the [DHHR], in a child abuse or neglect case, to prove 'conditions existing at the time of the filing of the petition . . . by clear and convincing [evidence].' The statute, however, does not specify any particular manner or mode of testimony or evidence by which the [DHHR] is obligated to meet this burden." Syllabus Point 1, *In Interest of S.C.*, 168 W.Va. 366, 284 S.E.2d 867 (1981).

Syl. Pt. 1, *In re Joseph A.*, 199 W.Va. 438, 485 S.E.2d 176 (1997) (citations omitted). This Court has explained that "'clear and convincing' is the measure or degree of proof that will produce in the mind of the factfinder a firm belief or conviction as to the allegations sought to be established." *In re F.S.*, 233 W.Va. 538, 546, 759 S.E.2d 769, 777 (2014) (citing *Brown v. Gobble*, 196 W.Va. 559, 564, 474 S.E.2d 489, 494 (1996)). However, "the clear and convincing

---

[5]As part of her argument, petitioner addresses several paragraphs in the petition and argues that they did not contain actual, identifiable allegations against petitioner. To the extent that petitioner is arguing that the petition was insufficient, we find that she is entitled to no relief in that regard as she failed to object to the same during the proceedings below. *See Jessie*, 225 W.Va. at 27, 689 S.E.2d at 27. To the extent that petitioner is arguing that the DHHR did not prove the allegations by clear and convincing evidence, we note that we disagree for the reasons set forth more fully herein.

standard is 'intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt in criminal cases.'" *In re F.S.*, 233 W.Va. at 546, 759 S.E.2d at 777 (quoting *Cramer v. W.Va. Dep't of Highways*, 180 W.Va. 97, 99 n.1, 375 S.E.2d 568, 570 n.1 (1988)).

This Court finds that there was clear and convincing evidence upon which to rule that petitioner made false allegations of sexual abuse by the father and sought psychiatric treatment for D.H.-1 to the detriment, and against the best interests, of the child. Throughout her brief on appeal, petitioner argues that the circuit court should not have found that she falsely accused the father of sexual abuse, as she simply reported that D.H.-1 disclosed that her father rubbed her leg and that it scared her. Petitioner argues that she only reported her child's statement and symptoms, but at no time accused the father of sexual abuse. As such, petitioner alleges that any argument by the DHHR or finding by the circuit court that she made such allegations are false, improperly assumed, and misconstrued. We disagree.

During the adjudicatory hearing, despite her testimony that she "never said that [the father has] sexually molested his daughter[,]" petitioner stated that she had "questions" regarding what happened. When asked how many times she had "questioned" what happened, petitioner responded "[t]hrough the entire [f]amily [c]ourt process and I have went to various professionals and [have] never gotten an answer." Later, petitioner was specifically asked whether she believed her child was sexually abused and she responded "I believe something happened, yes." Further, D.H.-1's admission note from Brook Lane Hospital indicates that when petitioner brought the child to be admitted, she reported to the staff that D.H.-1 disclosed that she had been inappropriately touched by the father. The medical record clearly noted that "[s]tressors include allegations of inappropriate sexual behavior from father towards [D.H.-1]." As such, the record demonstrates that petitioner believed that her children had been sexually abused by the father, that she took action based upon those beliefs by going to various professionals to seek help, and that she understood that people were taking her disclosures to be allegations of sexual abuse. Petitioner's statements during cross-examination that she was not "saying that any sexual abuse or assault occurred" but merely had "questions" ring hollow in light of the substantial evidence to the contrary. Sexual abuse by the father was never substantiated, the children did not disclose sexual abuse at any time, and no medical records were submitted into evidence demonstrating that the children had been sexually abused. Accordingly, we find that there was clear and convincing evidence upon which the circuit court could find that petitioner wrongfully made allegations of sexual abuse against the father.

Further, we find that there was clear and convincing evidence upon which to find that petitioner wrongfully sought psychiatric hospitalization for D.H.-1. The records from Brook Lane Hospital note that D.H.-1 was admitted due to "aggressive behaviors, suicide attempt and homicidal threat towards [petitioner]." However, throughout her five-day stay at the hospital, D.H.-1 did not exhibit any of the behaviors alleged by petitioner. The records indicate that she "was cooperative with the treatment team and participated in individual, group and family therapy and did not engage in any violent or self injurious behaviors." While petitioner is correct that Brook Lane Hospital staff diagnosed the child with disruptive mood dysregulation disorder and ADHD, and felt the need to prescribe medication, we note that the child was subsequently seen at Chestnut Ridge Hospital and diagnosed with adjustment disorder in the context of a high conflict divorce. Chestnut Ridge Hospital opined that the child needed therapy, not medication.

8

To the extent that petitioner suggests that her argument is supported by the fact that the child was diagnosed by medical professionals based upon her alleged behavior, we note that it was petitioner who provided the reports of misbehavior to the medical personnel and the diagnoses were not entirely based on professional observation.

Several witnesses testified that D.H.-1 did not exhibit behavior warranting hospitalization. A law enforcement officer testified that he responded to petitioner's plea for help with an "unruly" child but opined that the child did not exhibit any behaviors such that she should have been hospitalized. According to the officer, the child was not obeying her mother, which evidenced a discipline problem but not a mental health problem. Further, the father testified that since being placed in his care, the child's behavior was challenging but did not necessitate medical assistance. Also of note was the fact that D.H.-1 denied suicidal or homicidal ideations, and that both children denied that D.H.-1 had attempted to harm the dog, as alleged by petitioner. Based on the lack of reliable medical evidence, along with the testimony of several witnesses, we find that there was clear and convincing evidence upon which to find that petitioner wrongfully attempted to have D.H.-1 admitted to a psychiatric hospital.

Having found clear and convincing evidence that petitioner wrongfully made allegations of sexual abuse against the father and wrongfully sought psychiatric treatment for the child, we further find that the circuit court properly adjudicated petitioner of abuse and neglect upon such findings.[6]

Pursuant to West Virginia Code § 49-1-201, an abused child is one

[w]hose health or welfare is being harmed or threatened by . . . [a] parent, guardian, or custodian who knowingly or intentionally inflicts, attempts to inflict, or knowingly allows another person to inflict, physical injury or mental or emotional injury, upon the child or another child in the home.

Here, sufficient evidence existed upon which to adjudicate petitioner as an abusing parent because she emotionally abused the children by making unfounded allegations of sexual abuse

---

[6]In support of her argument, petitioner focuses on several findings made by the circuit court which she asserts do not constitute abuse and neglect. For example, petitioner argues that the circuit court erred in finding that she exposed her children to four men, and that this fact in and of itself does not constitute abuse and neglect. Petitioner also argues that the finding that she exercised poor judgment by calling a psychologist after midnight on two occasions does not constitute abuse and neglect. While these findings, among others that petitioner addresses, might not constitute abuse and neglect individually, we note that when viewed as a whole with the other findings made by the circuit court, it is clear that petitioner was properly adjudicated as an abusing parent. Even assuming that these findings were improper as petitioner alleges, the record shows that there was sufficient evidence to adjudicate petitioner as an abusing parent based upon her false allegations of sexual abuse and her attempts to have D.H.-1 committed to a psychiatric hospital, as more fully developed above, without consideration of the other findings petitioner references. Accordingly, we find that petitioner is entitled to no relief in this regard.

against the father and caused them to be subject to medical evaluations, forensic interviews, and the underlying proceedings based upon these allegations.

Petitioner adamantly denies the circuit court's finding that she coached the children to make allegations during their forensic interviews. According to petitioner, the DHHR had to establish that the children were specifically coached to make false statements and that, as the children only disclosed true things that aligned with petitioner's disclosures, the circuit court erroneously found that petitioner coached the children and that such behavior constituted abuse and neglect. We disagree. During her interview, M.H. stated several times that there were things that she was "supposed" to tell the interviewer, counted off topics on her fingers, and reported that she had spoken about the interview with petitioner on at least two occasions. When viewed in light of the finding that petitioner was wrongfully making allegations of sexual abuse against the father, and knew that her statements were viewed as such, we find that the circuit court did not err in concluding that petitioner coached M.H. to make disclosures regarding the same during the forensic interview, and we find no error in the circuit court's consideration of this finding at adjudication.

Further, we find no error in the circuit court's conclusion that petitioner inappropriately attempted to seek psychiatric care for her child. Several witnesses testified that the child did not display behavior warranting hospitalization, the child denied the behaviors which petitioner alleged, and medical records demonstrated that petitioner sought no less-drastic treatment than hospitalization. In fact, the record demonstrates that petitioner called a psychologist who had not treated the child in an effort to aid her attempts to hospitalize D.H.-1. As such, the circuit court properly adjudicated petitioner as an abusing parent based upon clear and convincing evidence that the children were abused and/or neglected.

Petitioner next argues that the circuit court erred in failing to adhere to the rules of evidence. Specifically, petitioner challenges the circuit court's decision to allow two witnesses to testify to their opinions without laying a foundation or being identified as an expert in their field. We find no merit in petitioner's argument.

Petitioner first argues that Heather Carr, a DHHR worker with seven years of experience who also was qualified to perform Finding Words interviews, should not have been permitted to testify. According to petitioner, Ms. Carr testified to opinion matters without having been qualified as an expert witness. We find petitioner's argument regarding Ms. Carr to be without merit. Rule 602 of the West Virginia Rules of Evidence sets forth that

> [a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony. This rule does not apply to a witness's expert testimony under Rule 703.

Here, the record shows that Ms. Carr was asked whether, in her opinion, the children were sexually abused. At that point, counsel for petitioner objected to her ability to testify to her

opinion, questioning her qualifications. The circuit court overruled the objection,[7] but rather than continuing with the posed question, the DHHR rephrased to ask "[d]id you, did the children, did [D.H.-1] make any disclosures that her father sexually abused her?" Ms. Carr responded "[n]o, ma'am." When viewing the record, it is clear that the question was rephrased to allow Ms. Carr to state whether the children disclosed sexual abuse by the father based upon her personal knowledge of the matter, as she was present for the entirety of both interviews. Accordingly, we concur with the circuit court's ruling and find no error, as there was no need for Ms. Carr to have been qualified as an expert because she offered no opinion testimony.

Petitioner next raises issue with the circuit court's decision to permit Ms. Talley to testify to whether the children were coached to make allegations during their forensic interviews. According to petitioner, Ms. Talley was an unqualified witness who provided expert testimony. However, the record clearly shows that Ms. Talley testified as to her knowledge, skill, training, and education, thus satisfying the requirements of West Virginia Rule of Evidence 702.[8] Specifically, she testified that she oversees all of the staff at the CAC and performs the forensic interviews of the children based on referrals from Child Protective Services, law enforcement, mental health providers, and in-home service providers. Moreover, Ms. Talley testified that she went through a certification process through the West Virginia Prosecuting Attorney's Institute in order to become certified as a forensic interviewer and completed follow-up peer reviews in order to remain up-to-date on the topic, including training on how to look for signs of coaching. Ms. Talley testified that she was certified to render opinions on the children's disclosures and stated that she had performed well over 500 child interviews. While we acknowledge that the circuit court did not formally qualify Ms. Talley as an expert witness, it did find that she was qualified to testify to the matter. Based on a review of the record as a whole, we find an adequate foundation was established for this witness's expert testimony.

Petitioner further argues that the circuit court erred in that it failed to find that Ms. Talley broke protocol in her Finding Words interview. However, petitioner fails to cite to any law demonstrating how the circuit court erred and also fails to cite to any evidence demonstrating that Ms. Talley broke protocol during her interview. Pursuant Rule 10(c)(7) of the West Virginia Rules of Appellate Procedure,

> "[t]he argument must contain appropriate and specific citations to the record on appeal, including citations that pinpoint when and how the issues in the

---

[7]The circuit court found that Ms. Carr could respond to the question because she was a professional person who was qualified to perform Finding Words interviews, and had done so for quite some time in multiple counties. The circuit court further noted that the recorded interview would be viewed and taken into consideration in conjunction with the testimony.

[8]Rule 702(a) of the West Virginia Rules of Evidence sets forth that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."

11

assignments of error were presented to the lower tribunal. The Court may disregard errors that are not adequate supported by specific references to the record on appeal."

As such, we find that petitioner has failed to establish error in this regard.

Petitioner next assigns as error the circuit court's use of personal standards, rather than legal authority, to make several findings of fact. Specifically, petitioner argues that the circuit court erred in finding that petitioner exposing the children to her various boyfriends constituted abuse and/or neglect and that such a finding was based purely on the circuit court's improper personal standards. Petitioner argues that several other findings were similarly erroneous, such as the findings that petitioner exercised poor judgment in calling a psychologist after midnight, coached M.H. to make false statements, and sought treatment for D.H.-1 with a medical card. Even assuming that petitioner's argument is valid, we find that she is not entitled to relief in this regard. Here, the circuit court had sufficient evidence to find that petitioner wrongfully made allegations against the father to the detriment of the children and wrongfully sought psychiatric care for D.H.-1. As such, there was sufficient evidence for the circuit court to properly make findings and adjudicate petitioner based upon the same apart from the allegedly improper findings raised by petitioner in this assignment of error. For this reason, we find no reversible error.

In conclusion, petitioner argues that the circuit court erred in terminating her custodial rights and failed to give proper weight to the testimony of her expert psychologist when making its decision.[9] Petitioner also argues that the circuit court failed to address the issues of neglect with regard to the father.[10] We disagree. West Virginia Code § 49-4-604(b)(6) provides that

---

[9]We find no merit in petitioner's argument that the circuit court did not assign proper weight to her expert witness's testimony. Petitioner effectively argues that her expert witness made findings that specifically rebutted the report of another psychologist which was submitted into evidence by the DHHR. We note, however, that the circuit court found that during the dispositional hearing petitioner's expert witness largely testified to adjudication, not disposition, and afforded the testimony weight accordingly. We have previously held that "[a] reviewing court cannot assess witness credibility through a record. The trier of fact is uniquely situated to make such determinations and this Court is not in a position to, and will not, second guess such determinations." *Michael D.C. v. Wanda L.C.*, 201 W.Va. 381, 388, 497 S.E.2d 531, 538 (1997). Therefore, we find petitioner's argument to be without merit.

[10]We similarly find no merit in petitioner's argument that the circuit court's "failed" to address alleged issues of neglect regarding the father. Petitioner cites to no authority in support of this portion of her argument and only provides self-serving statements regarding the father's alleged behavior which were not provided to the circuit court below. Moreover, at all times during the proceedings below, the father was considered to be a non-offending parent. Through reviewing the evidence, the circuit court determined that petitioner made false allegations against the father, and ultimately found that continued placement with the father was proper and in the children's best interest. Accordingly, we find no error in this regard.

circuit courts are to terminate parental rights upon findings that there is "no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future" and that termination is necessary for the child's welfare. According to West Virginia Code § 49-4-604(c)(3), a situation in which there is no reasonable likelihood the conditions of abuse and neglect can be substantially corrected includes one in which

> [t]he abusing parent or parents have not responded to or followed through with a reasonable family case plan or other rehabilitative efforts of social, medical, mental health or other rehabilitative agencies designed to reduce or prevent the abuse or neglect of the child, as evidenced by the continuation or insubstantial diminution of conditions which threatened the health, welfare or life of the child[.]

Here, the record demonstrates that petitioner was granted the opportunity to participate in services designed to address the conditions of abuse and neglect. However, the service provider testified that petitioner would only provide him with one day of availability per week despite needing to schedule two classes per week. Petitioner would not attempt to reschedule classes outside of the date she provided, despite being offered evening and weekend availability. As such, the service provider terminated petitioner's services due to noncompliance. Moreover, petitioner continued to deny wrongdoing, testifying at the dispositional hearing that she "did not do anything wrong." In fact, petitioner continues to make accusations of neglect against the father in her brief on appeal and deflects from her own culpability. In addressing a parent's refusal to acknowledge the truth of the basic allegations against them, we have determined that

> [i]n order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense.

*In re Timber M.*, 231 W.Va. 44, 55, 743 S.E.2d 352, 363 (2013) (quoting *In re: Charity H.*, 215 W.Va. 208, 217, 599 S.E.2d 631, 640 (2004)). Because petitioner failed to acknowledge the conditions of abuse and neglect, she could not adequately address or correct the same. We have previously held that "courts are not required to exhaust every speculative possibility of parental improvement . . . where it appears that the welfare of the child will be seriously threatened. . . ." *Cecil T.*, 228 W.Va. at 89, 717. S.E.2d at 873, Syl. Pt. 4, in part.

Based upon the evidence, we agree with the circuit court's decision to terminate petitioner's custodial rights, as there was sufficient evidence to find that there was no reasonable likelihood that petitioner could correct the conditions of abuse and/or neglect and that termination was necessary for the children's welfare. As circuit courts may terminate custodial rights upon such findings, we find no error.

For the foregoing reasons, we find no error in the decision of the circuit court, and its September 22, 2017, order is hereby affirmed.

Affirmed.

**ISSUED**:  October 12, 2018


**CONCURRED IN BY**:

Chief Justice Margaret L. Workman
Justice Elizabeth D. Walker
Justice Paul T. Farrell sitting by temporary assignment
Justice Tim Armstead
Justice Evan H. Jenkins

Justice Allen H. Loughry II, suspended and therefore not participating

14