**FILED**

**March 9, 2022**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

*In re* **K.R., U.C., and D.C.**

**No. 21-0239** (Berkeley County 20-JA-37, 20-JA-38, and 20-JA-39)

**MEMORANDUM DECISION**

Petitioner Mother D.R., by counsel Jeffery Gould, appeals the Circuit Court of Berkeley County's December 14, 2020, order terminating her parental rights to K.R., U.C., and D.C.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey and James Wegman, filed a response in support of the circuit court's order and supplemental appendices. The guardian ad litem, Jeffrey K. Matherly, filed a response on the children's behalf in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in adjudicating her as an abusing parent, denying her motion for an improvement period, and terminating her parental rights.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In February of 2020, the DHHR filed a child abuse and neglect petition alleging that petitioner engaged in domestic violence and excessive corporal punishment with U.C. and D.C. Specifically, the DHHR alleged that then-ten-year-old D.C. and then-eleven-year-old U.C. disclosed being handcuffed together in their room at night. U.C. and D.C. reported that they were punished for asking to go to the bathroom, so they relieved themselves in a closet. When the investigating DHHR worker arrived at the home, she found U.C. mopping the bedroom, which also contained no furniture. The worker observed urine stains and bleach smells and noted discoloration on the children's wrists and ankles, which could be consistent with the use of

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

1

handcuffs. When the children were asked to show where they slept, they indicated that their room was the room without furniture and pointed to a sheet on the floor. The worker interviewed petitioner, who denied the allegations stating that U.C. was diagnosed with schizophrenia and bipolar disorder and that petitioner was in the process of filing an incorrigibility petition against U.C. She stated that U.C. had been admitted to the psychological ward of the hospital six times. Petitioner also stated that she planned to take D.C. to a behavioral health provider but that she did not want to medicate the children. Petitioner stated that U.C. and D.C. had no bed at that time because they constantly defecated and urinated on the mattresses, which were discarded. She explained that D.C. and U.C. fight each other and that both children have stolen items from home and school. Petitioner told the worker that U.C. and D.C. are special needs and became jealous of their younger sibling, K.R., when he was born. She theorized that U.C. and D.C. fabricated the allegations in response to petitioner not allowing them to attend K.R.'s birthday party.[2]

During the investigation, the police department arranged for U.C. and D.C. to undergo individual child advocacy center ("CAC") interviews on February 11, 2020. U.C. disclosed that petitioner and the stepmother, Y.R., handcuffed her and D.C. together. U.C. stated that her arm was handcuffed to D.C.'s leg and that they were forced to sleep that way. U.C. also stated that the parents forced her and D.C. to drink urine out of the commode. She disclosed the withholding of her medication and food, and that the parents beat her with a belt and punched her in the mouth. She also described the parents using marijuana and drinking alcohol. When D.C. was interviewed, his answers were consistent with those of U.C., but he added that the stepmother struck him in the chest, threatened to make him sleep outside, and that petitioner threatened to kill him and U.C. Both children stated that petitioner did not want them and planned to put them "in the system."

The investigating DHHR worker interviewed the maternal grandmother, who stated that U.C. and D.C. had been placed in her care four times prior, that U.C.'s breath was foul and U.C. claimed it was because she was forced to drink urine, that the parents dropped U.C. and D.C. off without clothes, and that the grandmother offered to pay to treat U.C. and D.C.'s poor dental health. Most importantly, the grandmother reported that she had no behavior problems from U.C. or D.C. while they were in her care, that neither child had urinated or defecated on themselves, and that the children always asked permission to use the bathroom. The grandmother told the worker that she believed U.C. and D.C.

Lastly, the worker interviewed the stepmother, who denied the allegations, stating that U.C.'s medication was ineffective, the children were constantly in trouble at school, and the couple had a set of handcuffs that were for "personal use." She stated that U.C. and D.C. had bunkbeds, but they destroyed them. The stepmother stated that U.C. was on a waiting list for a residential placement. Thereafter, the worker interviewed close family friends, who stated that they had not seen U.C. or D.C. exhibit the behaviors described by petitioner and the stepmother.

During a preadjudicatory hearing in April of 2020, the court ordered U.C. and D.C. to undergo a second CAC interview. The circuit court held contested adjudicatory hearings in June and July of 2020. First, Corporal Jared Luciano of the Martinsburg Police Department testified

---

[2]As a result of the allegations, petitioner and the stepmother were arrested for charges of child abuse. They were subsequently released on bond.

that he investigated petitioner and the stepmother and that they were arrested for child abuse. He stated that he assisted in the children's initial CAC interviews and that he interviewed D.C., who stated that he had been handcuffed to U.C. multiple times and forced to sleep that way for approximately one week. The officer stated that D.C. was very cooperative, appeared sad and ashamed, and in the officer's opinion, was truthful during the interview.

Petitioner testified that she purchased a pair of police-style handcuffs for her and her wife to use for "sexual purposes" on January 21, 2020, but denied ever using the handcuffs on U.C. and D.C. She stated that the children were untruthful because they would not accept punishment. According to petitioner, the children would "make up stories" when they "did not get their way." Petitioner denied the allegations of forcing the children to drink urine and opined that the grandmother possibly coached U.C. and D.C. She further denied physical abuse of either child but admitted to spanking them. Petitioner explained that U.C. and D.C. were jealous of her relationship with the stepmother despite the couple having been married for four years. Petitioner stated that U.C. and D.C. urinated and defecated on themselves, on furniture, on clothing, and on the floors of their bedrooms despite the bedroom being next to the bathroom. She also stated that she was mopping the room when the officer and DHHR worker came to the home. When questioned about prior child abuse and neglect allegations, petitioner indicated that she had a pending case in Pennsylvania regarding allegations of physical abuse of U.C., and that she was taking parenting classes as required by that case. She gave no further details regarding that case. Petitioner testified that U.C. and D.C. slept on a bed in the room with K.R. while they waited for the urine smell to dissipate from the prior bedroom that U.C. and D.C. ruined. She further stated that D.C. was diagnosed with an intellectual disability and that U.C. had "defiant disorder" but was medicated, and the parents were seeking psychological services for U.C. As a result of U.C.'s poor behaviors at school, petitioner stated that she filed an incorrigibility petition prior to the child abuse and neglect petition being filed. On cross-examination, petitioner stated that for punishment, U.C. and D.C. would stand in a corner or exercise by doing sit-ups or jumping jacks. Petitioner could not explain why U.C. had not been enrolled in therapy at the same center where she received medication. When asked why D.C. was punished for stealing food, petitioner stated that she never withheld food from the children, but the food D.C. took was meant to be discarded in the garbage.

The stepmother testified that she worked often and was not the primary caretaker of the children. She denied all allegations of abuse and denied excessively disciplining the children. The stepmother agreed with petitioner that U.C. and D.C. were jealous of K.R. and exhibited defiant behaviors such as stealing items, urinating on shoes and beds, and fighting. The stepmother testified that although the couple purchased the handcuffs, they remained under the couple's mattress and were never used. She also stated that U.C. and D.C. lied often and would eat junk food when they were not allowed to do so. Regarding punishment, the stepmother testified that in addition to what petitioner described, U.C. and D.C. would be required to do chores or not be allowed to play outside. The couple also withheld things from them as punishment, like candy or games. The stepmother stated that she and petitioner attempted to avoid spanking due to the prior incident in Pennsylvania. On cross-examination, the stepmother stated that despite U.C. and D.C. having behavioral issues such as bedwetting, the children always slept through the night and her sleep had not been disturbed in the four years that she had been living with them.

3

Next, the investigating DHHR worker testified that the initial referral was made by a police officer after he interviewed D.C. and U.C. at their respective schools and they reported being handcuffed together. The worker went with the officer when he executed a search warrant of the home. When she asked U.C. and D.C. to show where the household members slept, they pointed to one room with a bed and stated that the stepmother slept in there, pointed to another room with a bed and a play pen and stated that petitioner and K.R. slept in that room, and then pointed to the room empty of furniture and indicated that was where they slept. The worker stated that she asked them whether they were given a pillow or anything else and they just pointed to a sheet on the floor. At that time, the worker stated that she ceased questioning and removed the three children. Later, the worker stated that she attended the initial CAC interviews of U.C. and D.C. Notably, child protective services records from petitioner's Pennsylvania case were introduced and admitted through the worker, who testified that a referral was made after U.C. was "covered in bruises head to toe" and that the referral was substantiated, resulting in an open case in Pennsylvania. On cross-examination, the worker stated that when she interviewed the maternal grandmother and two close family friends, the three women denied witnessing any of the severe behavioral problems described by petitioner and the stepmother. However, she stated that U.C. and D.C.'s aunt requested that the children be placed elsewhere after U.C. threatened to cut herself. According to the worker, the children did not urinate or defecate on themselves while in the aunt's care.

The forensic interviewer testified that she interviewed U.C., and Corporal Luciano interviewed D.C. on February 11, 2020. The interviewer stated that U.C. was cooperative and easy to talk to about difficult topics. U.C. reported being handcuffed to D.C. at night to prevent them from going to the bathroom or to the kitchen to get food. U.C. described her wrist being handcuffed to D.C. and stated that she believed her parents did this to also make her have "an accident" so they could punish her. U.C. also disclosed being punched in the face twice by the stepmother, resulting in a chipped tooth that was not repaired by a dentist. U.C. described another incident where all members of the house urinated in the same commode, and U.C. was forced to drink the contents. She described the smell and taste in graphic details. She also stated that her parents did not want her and D.C., she had no place in the world, and that she did not want to return to petitioner's home. In the interviewer's opinion, she observed several indicia of credibility during U.C.'s interview including U.C. not guessing at answers to appease her, U.C. correcting the interviewer when she deliberately changed details, and U.C. giving sensory details such as the handcuffs being metal, silver, and unable to click back once they were on her wrist. U.C. also stated that the key to the handcuffs was in the stepmother's closet. During this examination, U.C. and D.C.'s initial CAC interviews were admitted into evidence.

The ongoing DHHR worker testified that during placement with an aunt, D.C. exhibited tantrums after being placed in isolation in his bedroom. She also explained that the aunt ran a daycare and was overwhelmed with taking care of U.C. and D.C. On cross-examination by the guardian, the worker stated that the DHHR decided to place U.C. and D.C. with their biological father in March of 2020 after determining that petitioner had withheld contact with the children and their father and deemed him nonabusing. U.C. and D.C. both expressed to the worker that they wanted to see their father. When asked about any other concerning behaviors of the children, the worker stated that the paternal grandmother reported that when U.C. accidentally broke something, she curled up in a defensive ball on the couch. The worker stated that U.C. and D.C. had not complained about living with their father and the father had not reported the concerning behaviors

such as the children urinating on themselves or destroying furniture. The worker testified that during a multidisciplinary team meeting ("MDT"), the father and the paternal grandparents stated that petitioner and the stepmother took the children when all of the parties lived in Baltimore and did not tell them where they went. According to the worker, neither petitioner nor the stepmother denied these statements at the MDT.

Finally, Officer Kevin Gayle of the Martinsburg Police Department testified that he became involved in the case when the vice principal of D.C.'s school contacted him. The officer stated that petitioner had called the school regarding D.C. being in trouble for stealing food and urinating in the closet, but D.C. told the principal that he could not have done it because he had been handcuffed. The officer explained that when he interviewed D.C. at the school, he recorded the conversation on his body camera and that he also took pictures. D.C. stated that he had been getting handcuffed to his sister U.C. for about a week. The officer then went to U.C.'s school, and when he interviewed her, she also stated that they had been handcuffed to each other. The officer noted the discoloration on D.C.'s wrists and U.C.'s ankles. The officer testified that he executed a search warrant on the home and found evidence corroborating the children's statements. He found a set of handcuffs under the mattress, urine stains in the closet, and a belt, which the children said was used to tie the door shut. Notably, the officer found the belt looped within the buckle. During the examination, the body camera footage containing interviews of D.C. and U.C. was viewed in open court and admitted into evidence. The court held its ruling in abeyance while waiting to review U.C. and D.C.'s second CAC interviews.

Following the disclosure of the CAC interviews and in considering the evidence gathered over several hearings, the circuit court adjudicated the children as abused and neglected children and petitioner as an abusing parent. The court noted that U.C. and D.C.'s disclosures in the second CAC interviews remained consistent with their first CAC interviews and that the children appeared credible as their stories were corroborated by other evidence. The court also noted that U.C. had been in trouble at school for stealing milk and food, which supported the children's claims that the parents withheld food. The court found petitioner's theory that U.C. and D.C. concocted the allegations together to be wholly incredible because the children reported the same allegations to the same police officer while they were each at their individual schools. The circuit court also found that the DHHR was not required to make reasonable efforts to preserve the family unit based upon "the severity of the acts, the handcuffing, the withholding food, the refusing to let the children go to the bathroom, making the children drink out of the toilet, and the physical abuse." According to the court, these acts constituted aggravated circumstances pursuant to West Virginia Code § 49-4-602(d)(1) due to chronic abuse.

In September of 2020, the circuit court held a final dispositional hearing. The DHHR called petitioner's case worker, who recommended termination of petitioner's parental rights. Petitioner did not testify. The court found that petitioner and the stepmother failed to acknowledge the level of abuse described by U.C. and D.C. The court specifically stated, "[w]hen you have that type of serious injury to a child, physical and emotional abuse of a child, that extends to other children who may be in the home, so those findings also apply to [the stepmother]." The circuit court further found that there was no reasonable likelihood that petitioner could substantially correct the conditions of neglect or abuse in the near future and that termination of her parental rights was

necessary for the children's welfare. Accordingly, the circuit court terminated petitioner's parental rights by its December 14, 2020, order. Petitioner now appeals that order.[3]

The Court has previously held:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner argues that the circuit court erred in adjudicating her as an abusive parent. According to petitioner, U.C. and D.C.'s statements about the handcuffs were inconsistent because U.C. stated during the first CAC interview that her wrist had been cuffed to D.C.'s ankle, but the police photographs show bruising on her ankle, not her wrist. Further, petitioner argues that D.C. stated that he and U.C. were handcuffed hand to foot, which would require two sets of handcuffs and only one set was found. Petitioner asserts that "the only evidence as to all of the allegations" are U.C. and D.C.'s statements and that these children should not be found credible due to their mental health problems and histories of lying and making up stories at school. Petitioner states that she and the stepmother testified contrary to U.C. and D.C.'s disclosures. Based on this evidence, petitioner argues that the circuit court erred in finding clear and convincing evidence that petitioner was an abusing parent. However, petitioner's argument misstates the record on appeal, and we, therefore, find she is entitled to no relief.

This Court has held that

> [a]t the conclusion of the adjudicatory hearing, the court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected . . . . The findings must be based upon conditions existing at the time of the filing of the petition and proven by clear and convincing evidence.

---

[3]U.C. and D.C.'s father was deemed nonabusing, and the children achieved permanency in his care. The unknown father of K.R. had his parental rights terminated below. Y.R., the legal parent of K.R., had her parental rights also terminated below. According to the parties, the permanency plan for K.R. is adoption by his foster family.

*In re F.S.*, 233 W. Va. 538, 544, 759 S.E.2d 769, 775 (2014). This Court has explained that "'clear and convincing' is the measure or degree of proof that will produce in the mind of the factfinder a firm belief or conviction as to the allegations sought to be established." *Id*. at 546, 759 S.E.2d at 777 (citation omitted). However, "the clear and convincing standard is 'intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases.'" *Id.* (citation omitted). Further,

> "[West Virginia Code § 49-4-601(i)], requires the [DHHR], in a child abuse or neglect case, to prove 'conditions existing at the time of the filing of the petition . . . by clear and convincing [evidence].' The statute, however, does not specify any particular manner or mode of testimony or evidence by which the [DHHR] is obligated to meet this burden." Syllabus Point 1, *In Interest of S.C.*, 168 W.Va. 366, 284 S.E.2d 867 (1981).

Syl. Pt. 1, *In re Joseph A.*, 199 W. Va. 438, 485 S.E.2d 176 (1997) (citations omitted).

Here, the circuit court found that U.C. and D.C.'s disclosures in the second CAC interview remained consistent with their first CAC interview and that the children appeared credible as their stories were corroborated by other evidence, such as the police finding a pair of handcuffs and a belt knotted in a loop, as well as marks and bruises on the children's wrists and ankles. Although bruises were found on U.C.'s ankle instead of her wrists, this does not prove that her wrists could not have also been cuffed during one of the nights over the week's span of abuse. Additionally, D.C.'s statement that he was handcuffed to U.C. is consistent with one pair of handcuffs. A review of the record shows that U.C. and D.C.'s statements to school personnel, DHHR workers, police officers, and forensic interviewers remained largely consistent throughout the proceedings. Additionally, the forensic interviewer from the first CAC interviews opined that she observed several indicia of credibility during U.C.'s interview, including U.C. not guessing at answers to appease her, U.C. correcting the interviewer when she deliberately changed details, and U.C. giving sensory details such as the handcuffs being metal, silver, and unable to click back once they were on her wrist.

Contrary to petitioner's assertion that the "only" evidence against her was U.C. and D.C.'s statements, there was overwhelming corroborating evidence. Beyond the physical evidence of the lack of furniture in the bedroom with only a sheet on the floor, urine stains in the closet, the handcuffs, the belt, the bruises on the children, and U.C.'s chipped tooth, the DHHR workers testified regarding interviews with at least five other adults who did not observe the same negative behaviors from the children. The DHHR workers interviewed the maternal grandmother, who stated that U.C. and D.C. exhibited the odd behavior of asking permission to use the restroom, and the paternal grandmother stated that when U.C. accidentally broke something she curled into a defensive ball on the couch. The close family friends denied seeing any disturbing behaviors from the children, and U.C. and D.C.'s father did not report any issues with the children after they were placed in his care in March of 2020. Further, the aunt with whom the children were briefly placed did not report that U.C. and D.C. urinated or defecated on themselves. Finally, regarding the children's alleged poor behaviors at school or mental health problems, no witness testified to the children's school performances or their mental health diagnoses. Indeed, petitioner relied on the

children's mental health problems as a defense yet produced no records of the children's alleged extensive histories nor called a health care provider to testify.

Unlike U.C. and D.C., there were credibility issues with petitioner's and the stepmother's testimony. First, the stepmother testified that the children always slept through the night when she and petitioner testified that the children were bedwetting. Additionally, the DHHR worker stated that during an MDT, paternal family members explained that U.C. and D.C. had been withheld from them, and petitioner and the stepmother did not deny it. Finally, the court found that petitioner's theory that U.C. and D.C. concocted this story about being handcuffed and waited to use it was completely incredible considering that the two children reported the same allegations on the same day while being at two separate schools and unable to communicate with each other. The court below also noted that D.C. and U.C. got into trouble for stealing food, which was consistent with the allegations that petitioner was withholding food from them. We agree with the circuit court's conclusion that petitioner abused and neglected all three children and find that it is fully supported by the record below. Accordingly, we find no error in this regard.

Petitioner also argues that the circuit court erred in denying her motion for an improvement period and in terminating her parental rights. Petitioner complains that the court found that she failed to acknowledge the abuse and neglect of the children when she would have conceded that U.C. and D.C. had mental health needs and that petitioner "needed help in learning how to best parent them." However, she concedes in her brief that she did not file a written motion prior to the hearing and instead orally requested a post-dispositional improvement period at the final dispositional hearing. Not only did petitioner fail to file a written motion, the transcript of the dispositional hearing reveals that no evidence was presented in support of the oral motion. "A circuit court may not grant [an] . . . improvement period under W. Va. Code § 49-4-610[] unless the respondent to the abuse and neglect petition files a written motion requesting the improvement period." Syl. Pt. 4, *State ex rel. P.G.-1 v. Wilson*, -- W. Va. --, -- S.E.2d --, 2021WL 5355634 (2021). Accordingly, we need not review the circuit court's decision regarding an improvement period as petitioner's oral motion was not properly before the circuit court.

Nevertheless, we find that petitioner's argument in support of her claim that the court erred in denying an improvement period and in terminating her rights again ignores the evidence showing that she severely physically and emotionally abused and neglected U.C. and D.C. Petitioner's apparent denial of the facts of this case further serves to underscore the circuit court's conclusion that petitioner failed to acknowledge the conditions of abuse and neglect and failed to acknowledge the effect that her actions had on the children. As noted by the circuit court, petitioner never acknowledged her role in the abuse and neglect of the children. We have held that

[i]n order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable and in making an improvement period an exercise in futility at the child[ren]'s expense.

8

*In re Timber M.*, 231 W. Va. 44, 55, 743 S.E.2d 352, 363 (2013) (citation omitted). Petitioner's failure to acknowledge the severe physical and emotional abuse that she inflicted on U.C. and D.C. is significant evidence that an improvement period would have been futile.

This evidence further supports the circuit court's termination of petitioner's parental rights. West Virginia Code § 49-4-604(c)(6) provides that a circuit court may terminate a parent's parental rights upon finding that "there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future" and that termination of parental rights is necessary for the welfare of the children. Pursuant to West Virginia Code § 49-4-604(d), a circuit court may determine that there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected when "the abusing adult or adults have demonstrated an inadequate capacity to solve the problems of abuse or neglect on their own or with help." Here, petitioner's failure to acknowledge the conditions of abuse and neglect serves as a significant barrier to parental improvement. Without acknowledging the conditions of abuse and neglect, there was no reasonable likelihood that petitioner could correct those conditions within a reasonable time. Thus, we find no error in the circuit court's finding that there was no reasonable likelihood that the conditions of neglect and abuse could be substantially corrected in the near future.

Finally, we have held as follows:

"Termination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia Code § 49-4-604] . . . may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604(d)] . . . that conditions of neglect or abuse can be substantially corrected." Syllabus point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011). As the circuit court's finding is fully supported by the record on appeal, we find no error in the circuit court's termination of petitioner's parental rights.

For the foregoing reasons, we find no error in the decision of the circuit court, and its December 14, 2020, order is hereby affirmed.

Affirmed.

**ISSUED**: March 9, 2022

**CONCURRED IN BY**:

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice William R. Wooton
Justice Alan D. Moats sitting by temporary assignment